1   Jason W. Estavillo (Bar No. 188093)
    Elizabeth B. Cermak (Bar No. 330745)
2   LAW OFFICES OF JASON ESTAVILLO, PC
    1330 Broadway, Suite 436
3   Oakland, California 94612
    Telephone:  (510) 982-3001
4   Facsimile:  (510) 982-3002
5   Email: jason@estavillolaw.com
              elizabeth@estavillolaw.com
6
7   Attorneys for JoAnn L. Strickland

8                   IN THE UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11

12  JOANNE L. STRICKLAND,                    )   Case No.:
                                             )
13              Plaintiffs,                  )   COMPLAINT FOR:
                                             )   1.  Violations of Truth in Lending Act and 12
14      vs.                                  )       C.F.R. § 1026.32(c)-(d)
                                             )   2.  Violations of Truth in Lending Act and 12
15  RUSHMYFILE, INC., a business entity;     )       C.F.R. § 1026.34
    BAYSIDE MORTGAGE AND REAL               )   3.  Violations of Truth in Lending Act and 12
16  ESTATE SERVICES, INC., a business entity; )      C.F.R. § 1026.36
    JEREMY CIPOLLONE, in his capacity as     )   4.  Wrongful Foreclosure
17  owner and sole officer of Bayside Mortgage )   5.  Declaratory Relief
    and Real Estate Services, Inc.; SUPERIOR )   6.  Cancellation of Instruments
18  LOAN SERVICING, a business entity;       )
    ASSET DEFAULT MANAGEMENT, INC., a       )
19  business entity; MARK CAPALONGAN, an    )   DEMAND FOR JURY TRIAL
    individual; SANDRA CAPALONGAN, an       )
20  individual; JIMMY HUI, an individual; JING )
    FENG, an individual; HOU SANG WONG, an  )
21  individual; GILBERT CHOY, an individual;  )
    and DOES 1-20;                           )
22                                           )
                Defendants.
23  _____

24

25

26

27

28

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                      *Complaint*

1

COMES NOW Plaintiff, JOANNE STRICKLAND ("Plaintiff" or "Homeowner"), by and through her counsel for her Complaint against Defendants RUSHMYFILE, INC. ("Defendant RMF"), BAYSIDE MORTGAGE AND REAL ESTATE SERVICES, INC. ("Defendant BAYSIDE"), JEREMY CIPOLLONE ("Defendant CIPOLLONE"), LIL' WAVE FINANCIAL, INC. D/B/A SUPERIOR LOAN SERVICING ("Defendant SLS"), ASSET DEFAULT MANAGEMENT, INC. ("Defendant ADM"), and Defendants MARK CAPALONGAN, SANDRA CAPALONGAN, JIMMY HUI, JING FENG, HOU SANG WONG, GILBERT CHOY  (hereinafter, "Defendant INVESTORS") (collectively "Defendants"), pleads as follows:

## STATEMENT OF THE CASE

1.      In the present case, Plaintiff began working with Defendants BAYSIDE and its sole officer Defendant CIPOLLONE (hereinafter, referred to collectively as "Defendant CIPOLLONE") to refinance a first lien consumer mortgage on her long-time Home after separating from her husband and moving into a separate rental property by herself.  Plaintiff's husband and son continued living in the Home, and Plaintiff never concealed this fact from Defendant CIPOLLONE nor mentioned anything about potentially seeking a divorce.  While Plaintiff intended to eventually have her husband and son move out of the Home so she could rent out the Property to tenants, Defendant CIPOLLONE had complete understanding and knowledge that this remained a plan with an unknown timeline.  Despite this knowledge, Defendant CIPOLLONE insisted that Plaintiff should seek a "business purpose" loan, coordinated with Defendant RMF to find Defendants MARK CAPALONGAN, SANDRA CAPALONGAN, JIMMY HUI, JING FENG, HOU SANG WONG, and GILBERT CHOY (collectively, "Defendant INVESTORS") to fund the loan, and then facilitated the entire loan application and funding process.  At no point during the loan process did Plaintiff have any interaction or communication with anyone other than Defendant CIPOLLONE, who had such actual knowledge Plaintiff was still using the Home for personal and family purposes that he even came to the house looking for her to have her complete paperwork.  None of the Defendants ever offered Plaintiff any other loan options that she might have qualified for, had her complete credit counseling, or provided her with required notices for a loan secured by the primary dwelling of a borrower's family.  Furthermore, Plaintiff later learned that forged documents were even manufactured and included with

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:  (510) 982-3002

her application paperwork, without her knowledge, to perpetuate a false claim that the Home was already occupied by tenants.  Accordingly, Defendants and/or their agents deliberately extended a loan to Plaintiff they unquestionably knew or, in the alternative, should have known would be used to refinance a personal home mortgage and would be secured by the primary dwelling of Plaintiff's husband and son.  Defendants CIPOLLONE, RMF, and INVESTORS all stood to receive a monetary benefit from the transaction's consummation.

2.      As a direct consequence of the foregoing, Plaintiff entered a high-cost mortgage with an 12.50% interest rate, later raised to an astounding 18.50%, but low payments during the two-year term of the Loan.  Now, Defendants have conducted wrongful foreclosure activities on Plaintiff's Home and are demanding she pay over $893,664.69 in interest and fees as a condition of reinstatement.

## JURISDICTION AND VENUE

3.      This is an action asserting violations of Federal and California Law concerning the mortgage for Plaintiff's property.  Since this case involves several significant questions of federal law, this Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1331.  This Court likewise has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper and Defendants are subject to personal jurisdiction in the Northern District of California because all or most of the events giving rise to Plaintiff's claims occurred in and the subject property is located in this District.  42 U.S.C. 1391(b)(2).

5.      Pursuant to Local Rule 3-2(d) of this Court, assignment to the San Francisco Division of this Court is proper because all or most of the events giving rise to Plaintiff's claims occurred in and the subject property is located in Napa County.

## PARTIES

6.      Plaintiff JOANNE STRICKLAND is the true and rightful owner of the real property commonly known as 2192 First Ave., Napa, CA 94558 (the "Property" or "Home").

7.      Defendant RUSHMYFILE, INC. ("Defendant RMF") was a loan originator for Plaintiff's loan. Defendant RMF is a broker who operated as an agent of Defendant INVESTORS in the origination of Plaintiff's loan.

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile:   (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                                                          *Complaint*

3

8.      Defendant BAYSIDE MORTGAGE AND REAL ESTATE SERVICES, INC. ("Defendant BAYSIDE") was a loan originator for Plaintiff's loan.  Defendant BAYSIDE was a mortgage broker solely owned and operated by Defendant JEREMY CIPOLLONE that functioned as an agent of Defendants RMF and INVESTORS in the origination of Plaintiff's loan.  Plaintiff is informed, believes, and herein alleges that Defendant BAYSIDE's right to do business in the State of California was suspended by the California Secretary of State in or around 2020.

9.      Defendant JEREMY CIPOLLONE ("Defendant CIPOLLONE") was a loan originator for Plaintiff's loan.  Defendant CIPOLLONE was the sole owner and officer of Defendant BAYSIDE and operated as an agent of Defendants RMF and INVESTORS in the origination of Plaintiff's loan.

10.     Defendants MARK CAPALONGAN and SANDRA CAPALONGAN hold about 31.25% beneficiary interest in the Deed of Trust as husband and wife as joint tenants,

11.     Defendant JIMMY HUI holds about 18.75% beneficiary interest in the Deed of Trust.

12.     Defendant JING FENG holds about 12.50% beneficiary interest in the Deed of Trust.

13.     Defendant HOU SANG WONG holds about 20.83% beneficiary interest in the Deed of Trust.

14.     Defendant GILBERT CHOY holds about 16.67% beneficiary interest in the Deed of Trust.

15.     Defendant LIL' WAVE FINANCIAL, INC. D/B/A SUPERIOR LOAN SERVICING ("Defendant SLS") is the servicer of Plaintiff's Loan.

16.     Defendant ASSET DEFAULT MANAGEMENT, INC. is the Trustee for Plaintiff's Loan.

## STATEMENT OF FACTS

17.     In or around July 1993, Plaintiff purchased the property commonly known 2192 First Ave., Napa, CA 94558 (the "Property or "Home").

18.     Plaintiff resided in the Property, using it as her primary dwelling, from in or around July 1993 until in or around late 2016.

19.     In or around late 2016, Plaintiff separated from her husband and moved into a rental unit in Vallejo, California.  Plaintiff's husband and son continued to reside at the Property after Plaintiff moved out.

20.     By early 2017, Plaintiff had begun working with a mortgage broker and loan originator, Defendant BAYSIDE and its sole officer Defendant CIPOLLONE (hereinafter referred to collectively

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                                                      *Complaint*

4

as "Defendant CIPOLLONE"), to refinance the first lien mortgage on the Home.  The mortgage Plaintiff sought to refinance was a $285,000.00 loan originally obtained through World Savings Bank.

21.     Plaintiff had successfully navigated the 2008 Foreclosure crisis despite having a mortgage at the center of the portfolio that contributed to Wachovia's collapse and eventual government-forced sale to Wells Fargo Bank, however, once Plaintiff had separated from her husband in late 2016, Plaintiff wanted to fix up the Property, have her family move out, and start renting out her long-time Home to tenants.

22.     Accordingly, when Plaintiff began discussing a potential refinance of her mortgage that had originated with World Savings Bank, she acquiesced to Defendant CIPOLLONE's instance she could obtain better terms if he sought a "business purpose" loan for her.

23.     Defendant CIPOLLONE represented that he worked directly with companies that could connect her with private investors to fund her loan, including but not limited to including Defendants RMF and SLS.

24.     Plaintiff only directly interacted with Defendant CIPOLLONE when completing a loan application and providing the necessary documents.

25.     At no point in any of Plaintiff's communications or interactions with Defendant CIPOLLONE did she make any effort to conceal that her husband and son still resided in the Home.  Plaintiff told Defendant CIPOLLONE she was separating from her husband, but at no point mentioned anything regarding potentially seeking a divorce.

26.     Accordingly, Defendant CIPOLLONE had full and actual knowledge that Plaintiff was still legally married from the beginning of his dealings with Plaintiff.

27.     Among the documents Plaintiff provided to Defendants CIPOLLONE, RMF, BAYSIDE for her loan application was a current copy of her California Driver's License.  Plaintiff's license listed the Property's address as her permanent residence.

28.     Given that Plaintiff had moved out of her Home when she separated from her husband and intended to eventually have her husband and son move out of the Property so she could rent it to tenants, Plaintiff felt comfortable signing forms Defendant CIPOLLONE provided her stating the requested funds were intended for an investment purpose.

LAW OFFICES OF JASON W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                      *Complaint*

5

29.     Since Defendant CIPOLLONE knew Plaintiff's husband and son were living in the Home and persistently claimed Plaintiff should seek a "business purpose" loan, Plaintiff reasonably relied on Defendant CIPOLLONE's recommendation by signing the application documents he provided her.

30.     While Plaintiff was continuing to seek better loan terms with Defendant CIPOLLONE between May and August 2017, Plaintiff was informed by her husband and son that Defendant CIPOLLONE had gone to the Property looking for her.

31.     In or around early August 2017, Defendant CIPOLLONE notified Plaintiff he had found investors to fund a refinance of her mortgage.

32.     On or around August 15, 2017, Defendant CIPOLLONE sent Plaintiff documents to execute, including but not limited to a Promissory Note ("Note") for a $480,000.00 loan, secured by a Deed of Trust ("DOT") (collectively, the "Loan") in favor of Defendants MARK CAPALONGAN, SANDRA CAPALONGAN, JIMMY HUI, JING FENG, HOU SANG WONG, and GILBERT CHOY (collectively, "Defendant INVESTORS").  A true and correct copy of the Note is attached hereto as Exhibit A.  A true and correct copy of the DOT, recorded on or around August 15, 2017 in the official records of the Napa County Recorder as Doc No. 2017-0018273, is attached hereto as Exhibit B.

33.     The Note identifies Defendant SLS as Trustee for the DOT.

34.     According to the Note, the Loan had an 12.50% annual interest rate and was payable in 24 partially amortizing installments of $5,034.81each until on or around August 1, 2019, at which time the remaining balance of principal and interest would become due and payable in full.

35.     According to historical data published by the Freddie Mac Primary Mortgage Market Survey at freddiemac.com/pmms, the average rate for a 5/1 hybrid amortizing adjustable-rate mortgage for the week ending August 17, 2017 was 3.16%.

36.     If the balloon payment on August 1, 2019 was delinquent more than ten days, the Note provides Plaintiff would be charged $48,000.00 "as liquidated damages."

37.     In the event of default on any terms and conditions of the loan, the Note provides that Plaintiff would pay a "default interest rate in the amount 6.00% per annum, in addition to the current rate of 12.50%."  This default interest would "commence as of the date of the default and shall continue until such time default has been cured or loan has been paid off."

LAW OFFICES OF JASON W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                              *Complaint*

6

38.     The Note also contains an acceleration clause shared with the DOT, both of which state: "Beneficiary shall have the right of acceleration, at its option, to declare the Note …, irrespective of the maturity date expressed therein, and without demand or notice, immediately due and payable" in the event of sale or transfer of the Property.

39.     Around this same time, Plaintiff executed another loan with Defendants CIPOLLONE, RMF, and SLS related to another property ("Second Loan") ("Second Property").

40.     Strangely, Plaintiff found that the Napa Property address was listed as her residence in documents related to the Second Loan, while documents for her Loan related to the Napa Property listed the Second Property's address as her residence.  A true and correct copy of a Payment Statement for the Second Property, dated February 2018, is attached hereto as Exhibit C.

41.     Regardless, Defendants sent any and all correspondence related to Plaintiff's Loans to her Home in Napa County until in or around early 2018.

42.     In or around December 2017, an error in Defendant SLS's payment portal erroneously overcharged Plaintiff by more than $7,000.00, which caused her bank account to be overdrawn. Plaintiff immediately contacted Defendant SLS to have the error corrected.

43.     In an email to Defendant SLS sent on or around January 3, 2018, Plaintiff again requested that this erroneous overcharge be corrected.

44.     In the same email, Plaintiff also requested Defendants send any and all correspondence related to her Loans to the property where she had been living since separating from her husband.  A true and correct copy of this email, sent from Plaintiff to Defendant SLS on or around January 3, 2021, is attached hereto as Exhibit D.

45.     After being told by Defendant SLS that there was nothing they could do to fix the error their system had made, Plaintiff subsequently went through her bank to put a stop on the charges.

46.     Once Plaintiff's funds had been restored by her bank, Plaintiff promptly submitted the correct Loan payment to Defendant SLS.

47.     Despite Plaintiff's attempt to timely make the December 2017 payment and Defendant SLS's contribution to the error, Plaintiff was charged a late fee, told that all subsequent payments must be

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                      *Complaint*

7

made by certified check, and found that the interest rate on her Loan had been increased by six percent to a "Default rate" of 18.50%.

48.      As a direct result of the foregoing events, Plaintiff found herself struggling to keep up with payments on her Loan and began seeking refinancing.

49.      In her effort to obtain refinancing, Plaintiff engaged Mr. George Tanh Quang Nguyen of Loan Direct.

50.      Mr. Nguyen was able to find Plaintiff two or more new lenders prepared to offer her better loan terms, however, Defendant SLS subsequently and directly interfered with Plaintiff's efforts to finalize any of those offers.

51.      On or around March 20, 2018, Defendants INVESTORS and SLS caused to be recorded a Notice of Default ("NOD") on Plaintiff's Home, alleging that Plaintiff owed $36,359.92 in arrears as of March 16, 2018.  A true and correct copy of the NOD, recorded on or around March 20, 2018 in the official records of the Napa County Recorder's Office as Doc. No. 2018-0005251, is attached hereto as Exhibit E.

52.      On or around June 28, 2018, Defendants INVESTORS and SLS caused to be recorded a Notice of Trustee's Sale ("First NOTS") on Plaintiff's Home.  The First NOTS listed a total arrears of $560,579.14.

53.      In or around early April 2019, a new lender approved Plaintiff for a refinance of her Loan and was ready to close the deal on or around April 15, 2019.

54.      However, Defendants changed the payoff amount they had negotiated with that new lender at the last minute.

55.      Needing a final payoff amount to finalize the new loan, Plaintiff subsequently requested a payoff quote for her Home on or around May 16, 2019.

56.      Defendants then took two weeks to produce another payoff quote for the Napa Property, failing to produce it until May 31, 2019 despite having a postponed foreclosure sale scheduled only a week later on June 7, 2019.  This sale was later postponed again to June 14, 2019.

57.      As a result of this and other conduct, Plaintiff's escrow officer confided in Plaintiff that she had never seen any lender actively interfere in a refinancing as much as Defendants.

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:   (510) 982-3002

58.     Consequently, Plaintiff engaged an attorney and filed a lawsuit against Defendants in Napa County Superior Court as Case No. 19CV000899, alleging violations of Cal. Civ. Code §§ 2924d and 2924.17, Interference with prospective economic advantage, Breach of the Covenant of Good Faith and Fair Dealing, Unjust Enrichment, Negligence, Violation of Cal. Bus. & Prof. Code §§ 17200 et seq., and Violation of the Rosenthal Fair Debt Collection Act.

59.     On or around June 14, 2019, the Napa County Superior Court granted an Ex Parte Application for a Temporary Restraining Order enjoining the foreclosure sale of Plaintiff's Home scheduled for later that same day.

60.     On or around July 23, 2019, the Hon. Monique Langhorne heard and granted Plaintiff's subsequent Motion for an Order to Show Cause Re: Preliminary Injunction, thereby enjoining Defendants from conducting any further foreclosure activity on Plaintiff's Home for the duration of that litigation.  A true and correct copy of the Preliminary Injunction Order, entered in Napa County Case No. 19CV000899 on or around July 23, 2019, is attached hereto as Exhibit F.

61.     Thereafter, Napa County Case No. 19CV000899 was set for a jury trial beginning on or around August 23, 2021.

62.     In or around April 2021, Plaintiff discovered that, at some point during the application process for her Loan with Defendants, a lease agreement had been forged without her knowledge.  This lease agreement was purportedly entered on or around February 1, 2016 with Mr. Jose Alfredo Nunez and Maria Lopez Nunez, and provides for rental payments to be sent to 101 Muller Street, Vallejo, CA, 94590.  However, Plaintiff had never seen this agreement before, did not know any individuals with those names, and did not even know of the Muller Street address or move out of her Home in Napa to separate with her husband until in or around late 2016.  A true and correct copy of the forged Lease Agreement discovered by Plaintiff in or around April 2021 is attached hereto as Exhibit G.

63.     Despite this, between the filing of Case No. 19CV000899 on or around June 14, 2019 and in or around July 2021, the previous counsel for Plaintiff did not conduct any depositions of or propound any discovery on Defendants.

64.     On or around July 16, 2021, Plaintiff's previous counsel filed an Ex Parte Application to Continue Trial in Case. No. 19CV000899, which was subsequently heard and denied on July 20, 2021.

LAW OFFICES OF JASON W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimle:   (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                                 *Complaint*

9

65.     Then, on or around August 19, 2021, Plaintiff's previous counsel requested and was granted a dismissal of Case No. 19CV000899, without prejudice.

66.     Consequently, Plaintiff sought and retained new counsel in or around September 2021 to address the issues her previous counsel had not actively litigated or pursued.

67.     On or around September 27, 2021, Defendants proceeded to record a new Notice of Trustee's Sale ("NOTS") on Plaintiff's Home.  The NOTS contains a sale date of October 22, 2021 and lists a total arrears of $930,024.61 – or $893,664.69 *more than the amount of arrears listed on the NOD* recorded just two and half years prior.  A true and correct copy of the NOTS, recorded on or around September 27, 2021 in the official records of the Napa County Recorder's Office as Doc. No. 2021-0030315, is attached hereto as Exhibit H.

68.     To this day, Plaintiff's Driver's License list the Napa Home's address as her permanent residence.

69.     This lawsuit follows.

## FIRST CAUSE OF ACTION

### Violation Of Truth in Lending Act and 12 C.F.R. § 1026.32

(Against All Defendants)

70.     Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

71.     In response to the 2008 Recession, the United States Congress empowered the Bureau of Consumer Financial Protection to promulgate 12 C.F.R. § 1026.1 *et seq*, commonly known as "Regulation Z" (hereinafter, "Regulation Z").  The purpose of Regulation Z "is to promote the informed use of consumer credit by requiring disclosures about its terms and cost, to ensure that consumers are provided with greater and more timely information on the nature and costs of the residential real estate settlement process, and to effect certain changes in the settlement process for residential real estate that will result in more effective advance disclosure to home buyers and sellers of settlement costs."  12 C.F.R. § 1026.1(b).  To that end, Regulation Z includes "substantive protections," including the right of consumers to cancel credit transactions involving a lien on a consumer's principal dwelling and

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile: (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                    *Complaint*

10

1  prohibits acts or practices in connection with a loan secured by a dwelling or the consumer's principal

2  dwelling. *Id.*

3  72.     The provisions of Regulation Z and the Truth in Lending Act ("TILA") are "liberally construed

4  in the Ninth Circuit." *In re Loos* (1995) Bkrtcy.D.Ariz.1995, 189 B.R. 495.   Importantly, the

5  "provisions of the [Truth in Lending Act] and implementing regulations, as remedial legislation, are to

6  be broadly construed in favor of the consumer to implement" the Congressional intent of promoting

7  "the informed use of credit." *Millhollin v. Ford Motor Credit Co.* (D. Or. 1981) 531 F.Supp. 379, 384

8  [citing, e.g., *Riggs v. Government Emp. Financial Corp.* (9th Cir. 1980) 623 F.2d 68, 71.].

9  73.     Here, Defendants so effectively operated as agents of each other in the consummation and

10  execution of Plaintiff's Loan that Plaintiff only ever interacted or communicated with Defendant

11  CIPOLLONE of Defendant BAYSIDE (hereinafter, referred to collectively as "Defendant

12  CIPOLLONE") during the transaction.

13              A.   Defendants RMF and SLS are Agents of Defendant INVESTORS.

14  74.     Agency is "the fiduciary relationship that arises when one person (a 'principal') manifests

15  assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the

16  principal's control, and the agent manifests assent or otherwise consents so to act." *Jones v. Royal*

17  *Admin. Servs., Inc.*, 887 F.3d 443, 448 (9th Cir. 2018) (quoting *Mavrix Photographs, LLC v.*

18  *LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (as amended) [quoting Restatement (Third) of

19  Agency § 1.01 (Am. Law Inst. 2006)].  The legal consequences of an agent's actions may be attributed

20  to the principal and the principal therefore held liable for the agent's conduct under "a wide range of

21  common law agency theories." *Jones v. Royal*, *supra*, 887 F.3d at 448 (citing *Salyers v. Metro. Life*

22  *Ins. Co.*, 871 F.3d 934, 939 (9th Cir. 2017); *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC

23  Rcd. 6574, 6584 (2013)).

24  75.     Relevant agency theories include, but are not limited to, the legal theories described in

25  Restatement (Third) of Agency §§ 7.04 (when agent acts with actual authority or the principal ratifies

26  the agent's conduct), 7.05 (when the principal's special relationship with another person dictates that

27  the principal owes that person a duty of reasonable care with regard to the risk an agent of the principal

28  will harm the person or when the principal was negligent in selecting, training, retaining, supervising,

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:   (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                      *Complaint*

11

1   or otherwise controlling the agent), 7.07 (agent is an employee or contractor and commits a tort while

2   acting within the scope of employment or contract).

3   76.   Agency relationships are neither created nor defined solely by what the parties intended or

4   believe to be the result of their agreement, regardless of how reasonable the intent or belief, and

5   therefore the labels used by the parties regarding the relationship are not determinative. *See*, *e.g.*, *Shaw*

6   *v. Delta Airlines, Inc.*, 798 F. Supp. 1453, 1457 n.4 (D. Nev. 1992) (agency "is a legal concept that

7   depends on the manifest conduct of the parties; it 'does not depend upon the intent of the parties to

8   create it nor their belief that they have done so'") (quoting Restatement Second, Agency § 1); see

9   also *Chemtool, Inc. v. Lubrication Technologies, Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (an agency

10  relationship can be created by contract or by conduct; however, not all contracts create agency

11  relationships, and not all conduct creates agency relationships); *F.D.I.C. v. AmFin Financial Corp.*,

12  757 F.3d 530, 538, 59 Bankr. Ct. Dec. (CRR) 203, 114 A.F.T.R.2d 2014-5107 (6th Cir. 2014), cert.

13  denied, 135 S. Ct. 1402, 191 L. Ed. 2d 361 (2015) (holding that "regardless of contract language, an

14  agency relationship could have existed between AFC and members of the Affiliated Group, depending

15  on what the FDIC's evidence shows.") (internal quotation marks omitted).  For this reason, a written

16  agreement does not, per se, negate or limit the existence of the agency relationship or authority of an

17  agent to bind a principal "even if/where the language unambiguously states that no employee,

18  independent contractor, or agent of one company shall be deemed to be an employee, independent

19  contractor, or agent of the other." *Agency contrasted with contract*, 11 Bus. & Com. Litig. Fed. Cts. §

20  113:2 (4th ed.) (citing, e.g., *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 660 (4th Cir. 2019) ["It is

21  a familiar rule of agency, however, that parties cannot avoid the legal obligations of agency simply by

22  contracting out of them."]).

23  77.   Here, since Defendants RMF and SLS acted as the agents for Defendant INVESTORS by

24  soliciting them for investment in Plaintiff's Loan and thereafter arranging with Defendant

25  CIPOLLONE for Plaintiff's Loan to be executed, funded, and serviced, the conduct and liability of

26  Defendants RMF and SLS is attributable to Defendant INVESTORS under multiple theories of agency,

27  including but not limited to actual and apparent authority.

28

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile: (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                    *Complaint*

78.     Furthermore, since Defendant INVESTORS have a special fiduciary relationship with Plaintiff as the funders/lenders of her Loan, Defendant INVESTORS owed Plaintiff a duty of care with regard to the risk that conduct of their agents would harm her.  Given that Defendants RMF and SLS signed off on Plaintiff's Loan Application materials despite a forged Lease Agreement and Driver's License containing the Napa Property's address, their participation in perpetrating the violations of law at the origination of the Loan and/or their negligence during that process makes Defendant INVESTORS liable for the harm that conduct has caused Plaintiff.

79.     Even if Defendants RMF and SLS did not have the actual authority of Defendant INVESTORS, Defendant INVESTORS are still liable for the fraudulent or negligent conduct of Defendants RMF and SLS through the doctrine of respondeat superior and/or the special nature of their fiduciary relationship with Plaintiff.  Since Plaintiff's Driver's License containing her Napa Home's address and a forged loan application were both provided to Defendants RMF and SLS during the application process when they were acting within the scope of duties to be performed as Defendant INVESTORS' agents, Defendant INVESTORS were clearly negligent in selecting, training, retaining, supervising, or otherwise controlling their agent's activities.

80.     Lastly, since Defendants RMF and SLS either were or still are operating as the agent of Defendant INVESTORS, the conduct of any agents Defendants RMF and SLS employed in course of their duties to Defendant INVESTORS is likewise attributable to Defendant INVESTORS, rendering Defendant INVESTORS liable for any consequences of such agent's conduct.  *See Jones v. Royal*, *supra*, 887 F.3d at 448.

   B.   Defendants BAYSIDE and CIPOLLONE were Agents for Defendants RMF, SLS, and
                                   INVESTORS.

81.     Under a theory of apparent authority, a principal will be liable for the conduct of an agent when the agent commits a tort "while acting with apparent authority in its dealings with a third party purportedly on behalf of the principal."  Restatement (Third) of Agency § 7.08; *see also Jones v. Royal*, *supra*, 887 F.3d at 448.

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:   (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                        *Complaint*

13

82.    Here, since Defendant CIPOLLONE was the only individual Plaintiff interacted or communicated with during the loan application process, Defendants RMF and SLS are liable for the conduct of Defendant CIPOLLONE during the loan process.

83.    Since Defendants RMF and SLS were acting within the scope of their duties as the agent of Defendant INVESTORS while using Defendant CIPOLLONE as their agent, Defendant INVESTORS are likewise liable for the conduct of Defendant CIPOLLONE and the violations of law perpetrated in the origination of her Loan under a theory of respondeat superior.

84.    Similarly, since any negligence or fraud committed while Defendants RMF and SLS were operating within the scope of their duties to Defendant INVESTORS is attributable to Defendant INVESTORS, including negligence in utilization of agents, Defendant INVESTORS are liable for the consequences of Defendant RMF and SLS's negligence in utilizing Defendant CIPOLLONE as their agent. *See Jones v. Royal*, *supra*, 887 F.3d at 448.

85.    Lastly, since Defendant INVESTORS subsequently ratified all conduct of Defendants RMF, SLS, and their agent Defendant CIPOLLONE by executing and funding Plaintiff's Loan, Defendant INVESTORS are also liable for Defendant CIPOLLONE's conduct under a theory of ratification.

### C.    Regulation Z and § 1026.32 Apply to Plaintiff's Loan.

86.    The provisions of Regulation Z apply to individuals or business that offer or extend credit when: (1) the credit is offered or extended to consumers; (2) the offering or extension of credit is done regularly; (3) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (4) the credit is primarily for personal, family, or household purposes. 12 C.F.R. § 1026.1(c)(1).   Enforcement and liability for violations are provided by the Truth in Lending Act ("TILA"), the Competitive Equality Banking Act ("CEBA"), and the Real Estate Settlement Procedures Act ("RESPA").   12 C.F.R. § 1026.1(e).

87.    Here, Plaintiff's contact with Defendants RMF, SLS, and INVESTORS began when she sought to refinance her personal home mortgage through Defendants BAYSIDE and CIPOLLONE.

88.    Since Defendant CIPOLLONE was operating as the agent of Defendants RMF and SLS while Defendants RMF and SLS were acting within the scope of their duties to Defendant INVESTORS, all Defendants are liable for Defendant CIPOLLONE's conduct. *See*, *supra*, ¶¶ 73-84.

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*

14

*Complaint*

89.     Furthermore, Defendants are in the business of extending credit subject to finance charges and payable by a written agreement in more than four installments.

90.     Given that Plaintiff told Defendant CIPOLLONE her husband and son were still using the Napa Home as their primary dwelling, provided Defendant CIPOLLONE a copy of her Driver's License with the Napa Home's address on it, Defendant CIPOLLONE had such actual knowledge Plaintiff was seeking a mortgage on a Home her husband and son were living in that he even came to the Property to look for her, and Defendants subsequently sent correspondence related to her Loan to the Napa Home, Defendants knowingly or, in the alternative, negligently extended an offer of credit to a consumer whose family would benefit from the funds.

91.     Since Defendants and/or their agents nonetheless structured the Loan so it would appear in a form allowing evasion of requirements under Regulation Z, the Truth in Lending Act and Regulation Z undoubtedly apply to this case.  *See* 12 C.F.R. § 1026.34(b).

D.   Plaintiff's Loan is a High-Cost Mortgage Under Regulation Z.

92.     Section 1026.32 sets forth Regulation Z's requirements for high-cost mortgages.   Under § 1026.32, the definition of a "high-cost mortgage" includes any consumer credit transaction secured by the consumer's principal dwelling in which either: (1) the applicable annual percentage rate will exceed the average prime offer rate for a comparable transaction by more than 6.5 percentage points for a first-lien or 8.5 percentage points for a subordinate-lien; or (2) the total of points and fees for the transaction will exceed 5% of  the total loan amount for a loan of $20,000.00 or more.

93.     Here, Plaintiff's $480,000.00 Loan was originated in August 2017.  Since the historical data published by Freddie Mac shows an average offer rate of 3.16% at the time Plaintiff's Loan was originated with an 12.50% annual interest rate, the terms of Plaintiff's Loan provided a finance rate 9.34% above the average prime offer rate.

94.     Given that Plaintiff's Loan was 9.34% greater than the average offer rate, Plaintiff's Loan with Defendants is a high-cost mortgage under § 1026.32 of Regulation Z.

E.   Defendants Violated 12 C.F.R. § 1026.32.

95.     When a closed-end mortgage is subject to § 1026.32, the creditor extending the loan is required to make the following disclosures in a conspicuous type size: (1) Annual percentage rate; (2)

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:   (510) 982-3001
Facsimile:   (510) 982-3002

the amount of the regular monthly (or other periodic) payment and the amount of any balloon payment provided in the credit contract, if permitted; (3) for variable-rate transactions, a statement that the interest rate and monthly payment may increase and the amount of the single maximum monthly payment based on the maximum interest rate required to be included in the contract by § 1026.30; (4) the total amount the consumer will borrow; and (5) the following statement must be included in the disclosures: "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan."  12 C.F.R. § 1026.32(c)(1).

96.     Furthermore, any mortgage loan subject to § 1026.32 of Regulation Z may not include, among other things: (1) a balloon payment with a payment that is more than two times a regular periodic payment; (2) negative amortization; (3) advance payments; or (4) an increase in the interest rate after default.  12 C.F.R. § 1026.32(d)(1)-(8).

97.     Since the Note for Plaintiff's Loan does not include the statement required by § 1026.32(c)(1) nor the precise amount of the origination fee Plaintiffs were charged, Defendants violated that requirement of § 1026.32(c).

98.     Furthermore, since the Loan's Note provides that, in the event of default on any terms and conditions of the loan, Plaintiff would pay a "default interest rate in the amount 6.00% per annum, in addition to the current rate of 12.50% … until such time default has been cured or loan has been paid off" but § 1026.32(d)(4) of Regulation Z explicitly prohibits "[a]n increase in the interest rate after default," Defendants also violated § 1026.32(d) by explicitly and dramatically increasing the interest rate on Plaintiff's Loan after default.  12 C.F.R. § 1026.32(d)(4).

99.     Plaintiff has suffered and continues to suffer significant damages as a result of Defendants' violations of TILA and Regulation Z, including but not limited to loss of money through overcharges and unlawfully unfavorable loan terms, costs of attorneys' fees to save their family home, and now the potential loss of her Home of over 30 years.

LAW OFFICES OF JASON W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile: (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                                 *Complaint*

16

100.     Plaintiff therefore seeks the maximum damages and remedies permitted under 15 U.S.C. § 1640, including but not limited to the total sum of actual damages, twice the amount of any finance charges and fees in connection with the Loan, costs of suit, reasonable attorneys' fees as determined by the court, and an injunction against activities to offset any amount Plaintiffs allegedly owe in accordance with § 1640(h).

## SECOND CAUSE OF ACTION

### Violation Of Truth in Lending Act and 12 C.F.R. § 1026.34

(Against All Defendants)

101.     Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

102.     Section 1026.34 of Regulation Z describes specific acts or practices that are prohibited in connection with a high-cost mortgage.  Most relevantly, creditors "shall not structure any transaction that is otherwise a high-cost mortgage in a form, for the purpose, and with the intent to evade the requirements of a high-cost mortgage subject to this subpart."  12 C.F.R. § 1026.34(b).

103.     Furthermore, lenders are not permitted to extend a high-cost mortgage to a consumer unless the creditor receives "written certification that the consumer has obtained counseling on the advisability of the mortgage from a counselor that is approved to provide such counseling by the Secretary of the U.S. Department of Housing and Urban Development or, if permitted by the Secretary, by a State housing finance authority."  12 C.F.R. § 1026.34(a)(5).

104.     Here, Defendants and/or their agents deliberately extended a loan to Plaintiff they unquestionably knew or, in the alternative, should have known would be used to refinance a personal home mortgage and would be secured by the primary dwelling of Plaintiff's husband and son.  *See*, *supra*, ¶¶ 73-84.

105.     Since Defendants nonetheless intentionally structured Plaintiff's Loan so it would appear in a form that allowed them to evade requirements for a high-cost mortgage under Regulation Z, Defendants violated § 1026.34(b) of Regulation Z by purposefully structuring Plaintiffs' Loan with the intent to evade those requirements so they could reap the profits from predatory lending practices.

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                                                *Complaint*

17

106.    Additionally, since Defendants did not mention, require, nor receive written certification that Plaintiff "obtained counseling on the advisability of the mortgage" prior to executing the Loan documents, Defendants also violated § 1026.34(a)(5) of Regulation Z.

107.    Plaintiff has suffered and continues to suffer significant damages as a result of Defendants' violations of TILA and Regulation Z, including but not limited to loss of money through overcharges and unlawfully unfavorable loan terms, costs of attorneys' fees to save their family home, and now the potential loss of her Home of over 30 years.

108.    Plaintiff therefore seeks the maximum damages and remedies permitted under 15 U.S.C. § 1640, including but not limited to the total sum of actual damages, twice the amount of any finance charges and fees in connection with the Loan, costs of suit, reasonable attorneys' fees as determined by the court, and an injunction against activities to offset any amount Plaintiffs allegedly owe in accordance with § 1640(h).

### THIRD CAUSE OF ACTION

### Violation Of Truth in Lending Act and 12 C.F.R. § 1026.36

### (Against All Defendants)

109.    Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

110.    As previously stated, Regulation Z applies to individuals or business that offer or extend credit when: (1) the credit is offered or extended to consumers; (2) the offering or extension of credit is done regularly; (3) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (4) the credit is primarily for personal, family, or household purposes.  12 C.F.R. § 1026.1(c)(1).  Enforcement and liability for violations are provided by the Truth in Lending Act ("TILA"), the Competitive Equality Banking Act ("CEBA"), and the Real Estate Settlement Procedures Act ("RESPA").  12 C.F.R. § 1026.1(e).

111.    More specifically, the provisions of §§ 1026.36(c)(1)-(2) of Regulation Z apply to "closed-end consumer credit transactions secured by a consumer's principal dwelling," and the provisions of §§ 1026.36(d)-(i) apply to "closed-end consumer credit transaction secured by a dwelling."  12 C.F.R. § 1026.36(b).

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:   (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                      *Complaint*

18

A.  Defendants INVESTORS, RMF, BAYSIDE, and CIPOLLONE Are Loan Originators.

112.   Under § 1026.36 of Regulation Z, a "loan originator" is a person who, in expectation of direct or indirect compensation or other monetary gain, performs any of the following activities: takes an application, offers, arranges, assists a consumer in obtaining or applying to obtain, negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or through advertising or other means of communication represents to the public that such person can or will perform any of these activities. 12 C.F.R. § 1026.36(a)(1)(i).  When used in Regulation Z, the term "loan originator" is intended to "include an employee, agent, or contractor of the creditor or loan originator organization if the employee, agent, or contractor meets this definition."  *Id*.  The term also includes a creditor that "engages in loan origination activities if the creditor does not finance the transaction at consummation out of the creditor's own resources, including by drawing on a bona fide warehouse line of credit or out of deposits held by the creditor."  *Id*.  Lastly, the term "compensation" as used in § 1026.36 is defined as "salaries, commissions, and any financial or similar incentive."  12 C.F.R. § 1026.36(a)(3).

113.   Additionally, under § 1026.36(a)(2) of Regulation Z, a mortgage broker "with respect to a particular transaction" is defined as a "loan originator that is not an employee of the creditor."  12 C.F.R. § 1026.36(a)(2).

114.   Here, Defendants and/or their agents deliberately extended a loan to Plaintiff they unquestionably knew or, in the alternative, should have known would be used to refinance a personal home mortgage and would be secured by the primary dwelling of Plaintiff's husband and son.  *See*, *supra*, ¶¶ 73-84.

115.   Since Defendant CIPOLLONE was the only individual Plaintiff directly interacted or communicated with during the loan application process and Defendant CIPOLLONE took Plaintiff's application, directly communicated both the initial Loan offer and the final Loan terms to Plaintiff, arranged the appraisal of Plaintiff's Home, and, in coordination with Defendants RMF, otherwise assisted Plaintiff in obtaining the Loan in expectation of receiving around $9,600.00 in broker's fees, Defendant CIPOLLONE is a loan originator under § 1026.36(a)(1)(i).

116.   Since Defendant RMF took Plaintiff's application, offered Plaintiff the Loan, and, in coordination with Defendants INVESTORS and CIPOLLONE, arranged Plaintiff's Loan in

expectation of receiving the monetary benefit of around $9,600.00 in broker's fees, Defendant RMF is a loan originator under § 1026.36(a)(1)(i).

117.    Since Defendant INVESTORS offered Plaintiff the Loan and, in coordination with Defendants RMF, SLS, BAYSIDE, and CIPOLLONE, arranged Plaintiff's Loan in expectation of receiving the monetary benefit of thousands of dollars in interest, Defendant INVESTORS is a loan originator under § 1026.36(a)(1)(i).

118.    Under § 1026.36(e) of Regulation Z, loan originators "shall not direct or 'steer' a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer."  12 C.F.R. § 1026.3(e).

> B.   <u>Defendants Unlawfully Steered Plaintiff to Consummate the Subject Loan.</u>

119.    For the purposes of § 1026.36(e) and the prohibition on steering, a loan originator is required to present the consumer with options for the desired loan transaction which include: (1) the loan with the lowest interest rate; (2) the loan with the lowest interest rate without negative amortization a prepayment penalty, interest-only payments, a balloon payment in the first 7 years of the life of the loan, a demand feature, shared equity, or shared appreciation; or, in the case of a reverse mortgage, a loan without a prepayment penalty, or shared equity or shared appreciation; and (3) the loan with the lowest total dollar amount of discount points, origination points or origination fees (or, if two or more loans have the same total dollar amount of discount points, origination points or origination fees, the loan with the lowest interest rate that has the lowest total dollar amount of discount points, origination points or origination fees).  12 C.F.R. § 1026.36(e)(2), 1026.36(e)(3).

120.    This prohibition on directing or "steering" consumers to particular loan transactions was promulgated under the authority given to the Bureau of Consumer Financial Protection by the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, the stated purpose of which is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare" their various options, "avoid the uninformed use of credit, and to protect the consumer against" unfair credit practices.  15 U.S.C. § 1601(a).

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                                 *Complaint*

20

121.    Here, as previously discussed, Plaintiff provided Defendant CIPOLLONE a copy of her Driver's License with the Napa Home's address on it, Defendant CIPOLLONE even came to the Property to look for Plaintiff during the summer of 2017, and Defendants subsequently sent correspondence related to Plaintiff's Loan to the Napa Home.  Accordingly, Defendants CIPOLLONE, BAYSIDE, RMF and INVESTORS knew or, in the alternative, should have known, that Plaintiff's husband and son were still using the Napa Home as their primary dwelling at the time the Loan was originated.

122.    Since Defendant INVESTORS and its agents Defendants CIPOLLONE, BAYSIDE, and RMF were loan originators for Plaintiffs' Loan, failed to provide Plaintiffs any options other than the subject Loan, and thereafter received greater monetary benefit from the transaction than they would have from other loan transactions they could have offered Plaintiff, Defendant INVESTORS and their agents Defendants RMF, BAYSIDE, and CIPOLLONE unlawfully directed and steered Plaintiff to consummate the Loan in violation of the Truth in Lending Act and § 1026.36 of Regulation Z.

### C.  Assignees of the DOT Remain Liable.

123.    Since 15 U.S.C. § 1641 provides that any civil action for a violation of TILA brought against a creditor may be maintained against any assignee of that creditor where the assignment was involuntary, any subsequent assignees to the Property's Deed of Trust and Plaintiffs' Loan are also liable for the foregoing violations of TILA and Regulation Z.

124.    Plaintiff has suffered and continues to suffer significant damages as a result of Defendants' violations of TILA and Regulation Z, including but not limited to loss of money through overcharges and unlawfully unfavorable loan terms, costs of attorneys' fees to save their family home, and now the potential loss of her Home of over 30 years.

125.    Plaintiff therefore seeks the maximum damages and remedies permitted under 15 U.S.C. § 1640, including but not limited to the total sum of actual damages, twice the amount of any finance charges and fees in connection with the Loan, costs of suit, reasonable attorneys' fees as determined by the court, and an injunction against activities to offset any amount Plaintiffs allegedly owe in accordance with § 1640(h).

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone:  (510) 982-3001
Facsimile:  (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                     *Complaint*

21

## FOURTH CAUSE OF ACTION

### Wrongful Foreclosure

(Against Defendants INVESTORS and SLS)

126.    Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

127.    Here, since Defendants had actual knowledge or, in the alternative, should have known Plaintiff's family members were using the Home as their primary dwelling yet still extended a high-cost mortgage to Plaintiff in violation of the Truth in Lending Act and are now demanding payment of the accumulated interest and fees to reinstate Plaintiff's Loan, Defendants' foreclosure activities, including but not limited to recordation of the NOD and NOTS, have been illegal and willfully oppressive.

128.    Furthermore, since Defendants are now demanding Plaintiff pay over $893,664.69 in interest and fees allegedly accumulated since the NOD was recorded on or around March 20, 2018 as a condition of reinstatement yet Plaintiff has a right to the total sum of actual damages, twice the amount of any finance charges and fees in connection with the Loan, costs of suit, and reasonable attorneys' fees for Defendants' TILA violations under 15 U.S.C. § 1640, Plaintiff is excused from the requirement of tendering the full amount of the arrears prior to bringing a cause of action for Wrongful Foreclosure. *See Miles v. Deutsche Bank National Trust Co.*, 236 Cal. App. 4th 394, 408 (2015).

129.    Plaintiff has been and continues to be harmed by Defendants' wrongful foreclosure activity in amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Declaratory Relief

(Against Defendants INVESTORS and SLS)

130.    Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

131.    An actual controversy has arisen between the parties concerning ownership of the Property.

132.    Defendants claim to have the authority to have effectuate a sale of the Property.

LAW OFFICES OF JASON W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile: (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*

22

*Complaint*

133.    Plaintiff contends that the NOD and NOTS are invalid due to the illegality of Plaintiff's Loan and Defendants' violations of TILA described herein.

134.    Due to these actual controversies and the imminence of irreparable harm to Plaintiff if a foreclosure sale is allowed to proceed on October 22, 2021, Plaintiff seeks a declaration of the rights and duties of the parties with respect to ownership of the Property.

## SIXTH CAUSE OF ACTION

### Cancellation of Instruments

(Against Defendants INVESTORS and SLS)

135.    Plaintiff incorporates all allegations of this complaint and re-alleges them as though they were fully set forth herein.

136.    There remain outstanding written instruments which cause Plaintiff reasonable apprehension that, if left outstanding, may cause her serious injury.

137.    Specifically, Defendants recorded the alleged NOD and NOTS despite their violations of TILA and now claim these documents give them the legal authority to conduct a foreclosure sale of Plaintiff's Home.

138.    Plaintiff have been harmed by the alleged NOD and NOTS as they have placed Plaintiff in reasonable fear of imminently losing her Home of over 30 years.  Plaintiff will be irreparably harmed if these instruments are not cancelled.

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile: (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*                                                    *Complaint*

23

1

## **PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiff pleads for the following relief:

3

A.  For judgment to be entered in favor of Plaintiffs and against Defendants;

4

5

B.  For damages in excess of $25,000.00 or an amount to be proven at trial;

6

C.  For an order requiring Defendants to show cause, if they have any, why they should not be enjoined as set forth below, during the pendency of the action;

7

8

D.  For a temporary restraining order, preliminary injunction preventing Defendants, or anyone acting in concert with them from causing the Property to be sold, assigned, transferred to a third-party, or taken by anyone or any entity;

9

10

E.  For a preliminary injunction preventing Defendants, or anyone acting in concert with them from seeking to evict Plaintiffs until the claims herein are resolved;

11

12

F.  For recession of the unconscionable contract terms;

13

G.  For compensatory and statutory damages, special damages, attorneys' fees, and costs according to proof at trial; and

14

15

H.  For such other and further relief as the Court may deem just and proper.

16

17

Dated: October 18, 2021

18

**LAW OFFICES OF JASON W. ESTAVILLO, PC**

19

20

21

Jason W. Estavillo

22

Elizabeth B. Cermak

Attorneys for JoAnn L. Strickland

23

24

25

26

27

28

LAW OFFICES OF JASON
W. ESTAVILLO, PC
1330 Broadway, Suite 436
Oakland, CA 94612
Telephone: (510) 982-3001
Facsimile: (510) 982-3002

*Strickland v. RushMyFile, Inc., et al.*

24

*Complaint*



# PROMISSORY NOTE SECURED BY DEED OF TRUST
## (This Note contains an Acceleration Clause)
### PARTIALLY AMORTIZED BALLOON PAYMENT NOTE
### 1-4 RESIDENTIAL NON-OWNER-OCCUPIED PROPERTY
### BUSINESS PURPOSE LOAN

Loan No: R█████████
Loan Amount: $480,000.00

Property Address: 2192 1ST AVENUE, NAPA, CA 94558
BURLINGAME, California                    JULY 19, 2017

In installments as herein stated, for value received, JOANNE L. STRICKLAND, the undersigned Borrower(s), promise to pay to EXHIBIT D, the Beneficiary, or order, at a place that may be designated by the Beneficiary, the sum of: $480,000.00, FOUR HUNDRED EIGHTY THOUSAND DOLLARS exactly with interest from the date of funding on the unpaid principal at the rate of 12.50% percent per annum, payable in **24 partially amortizing installments** of $5,034.81 each, beginning on 09/01/2017, and continuing MONTHLY ON THE FIRST DAY OF EACH MONTH thereafter until maturity, 08/01/2019, at which time all sums of principal and interest then remaining unpaid shall be due and payable in full. Interest shall be calculated on a 360-day year and on an ordinary annuity calculation basis. At the option of the Beneficiary, each payment shall be credited first on interest then due, then on late charges, then on advances, then on fees and the remainder on principal; and interest shall thereupon cease upon the principal so credited.

**Default of payment.** Upon default in any payment of any installment, then the balance of this obligation shall become due immediately at the option of the Holder hereof. Principal, interest, and all funds are due Beneficiary payable in lawful money of the United States of America. Except where federal law is applicable, this Note shall be construed and enforceable according to the laws of the State of California for all purposes and any terms herein inconsistent therewith are hereby modified to conform to said law at the time of signing of these loan documents. Time is of the essence for each and every obligation under this Note.

---

**THE FOLLOWING PROVISIONS MAY RESULT IN THE COMPOUNDING OF INTEREST ON YOUR LOAN**

**At the option of the Beneficiary, if any payment should be insufficient to pay the interest then due, the balance of interest remaining shall be added to principal and will bear interest at the Note rate as the principal.**

**At the option of the Beneficiary, if any principal and/or interest installments, late charges, advances and/or costs should be repaid through or by any forbearance, bankruptcy plan or similar repayment plan or foreclosure, the total sum of these amounts will bear interest at the Note rate from the date due or advanced until the date repaid.**

---

If this Note is not paid when due, the Borrower(s) promise to pay, in addition to the principal and interest due under this Note, all costs of collection and any reasonable attorneys' fees incurred by the Beneficiary thereof on account of such collection, whether or not suit is filed hereon. Each Borrower consents to renewals, replacements, and extensions of time for payment hereof before, at, or after maturity; consents to the acceptance of security for this Note and waives demand, protest and any applicable statute of limitations. Advances shall bear interest at the interest rate stated in the note or the "Default" interest, whichever is higher, from date of advance until date paid in full.

**Payment late charge.** If any installment due hereunder is delinquent more than 10 days, the Borrower to this Note agrees to pay a late charge on each installment of $5.00 or 10.00% of the delinquent payment, whichever is larger. All late charges are to be paid immediately on demand.

**Balloon late charge.** In addition, if any balloon payment is delinquent more than TEN days, the borrower will be charged **$48,000.00** as liquidated damages.

Borrower acknowledges that its failure to make timely payments under this Note will cause Lender to incur additional expenses in servicing and processing the Loan and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charges provided for in this Note represent fair and reasonable estimates taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late payments. The late charges are payable in addition to, and not in lieu of, any default interest provided below.

**Return check charge.** Borrower and Beneficiary agree that it would be difficult to determine the actual damages to the Beneficiary or Beneficiary's agent for the return of an unpaid check provided by Borrower. It is hereby agreed that Borrower will pay the sum equal to 5% of the amount returned or $25.00, whichever is greater. However, in any event the maximum charge for an unpaid check is not to exceed the sum of $35.00. This amount is in lieu of any statutory monetary penalty, if any; however, Beneficiary does not waive any other rights that may be awarded under any statute. Should Borrower have two or more returned checks, for any reason, during the life of the loan, Beneficiary may demand that Borrower make payments in the form of cash, cashiers check or money order.

**Right to assign.** The holder of this Note shall have the right to sell, assign, or otherwise transfer, either in part or in its entirety, this Note, the Deed of Trust, and other instruments evidencing or securing the indebtedness of this Note to one or more investors without Borrower's consent.

**Prepayment penalty.** The principal and accrued interest on this loan may be prepaid in whole or in part at any time without penalty, however, Beneficiary is guaranteed to receive a minimum **6 months** of interest based on the original principal balance together with any interest paid or due in escrow.

**Default interest.** Should Borrower default on any terms and conditions of this loan, Borrower shall pay a default interest rate in the amount 6.00% per annum, in addition to the current rate of 12.50%, based on the principal balance and on all outstanding advances and advances to be made after default has occurred. Default interest shall commence as of the date of the default and shall continue until such time default has been cured or loan has been paid off.

**Advancing Fee.** For any advances made to senior encumbrances and/or obligations to protect the Beneficiary's interest in this Note, there will be an advancing fee equal to three (3%) of the amount so advanced subject with a minimum fee of fifty dollars ($50) per advance (per lender). Advances will bear interest at the same rate that is charged on the principal of this Note from the date of advancement to such date when all monies are paid in full in the form of cash and/or certified funds. ALL ADVANCES TO BE REPAID AT NOTE RATE OR DEFAULT INTEREST RATE, WHICHEVER ONE IS HIGHER, FROM DATE OF ADVANCE UNTIL DATE FUNDS ARE RECEIVED BY BENEFICIARY.

**Oral Representations.** The undersigned Borrower hereby states that neither the Beneficiary, nor their representative(s) nor any employee RUSHMYFILE, INC. has alluded to, given actual details(s) or discussed other terms of this loan other than what has been agreed to in writing.

**Severability; Entire Agreement; Amendments.** The parties intend that the provisions of this Instrument and all other Loan Documents, including the Deed of Trust securing the indebtedness, shall be legally severable. If any term or provision of this Instrument or any other Loan Document, including the Deed of Trust securing the indebtedness, be determined to any extent by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document, including the aforesaid Deed of Trust, shall not be affected thereby and each term and provision shall be valid and be enforceable to the fullest extent permitted by law. This Instrument and the aforesaid Deed of Trust contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**Binding.** This Note and all of the covenants, promises and agreements contained in it shall be binding on and insure to the benefit of the respective legal and personal representatives, devisees, heirs, successors, and assigns of the Borrower and the Beneficiary.

**Acceleration clause.** This Note is secured by a First Deed of Trust of even date herewith which contains the following provision:

**In the event of sale or transfer, conveyance or alienation of said real property, or any part thereof, or any interest therein, whether voluntary or involuntary (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred), Beneficiary shall have the right of acceleration, at its option, to declare the Note secured by the Deed of Trust, irrespective of the maturity date expressed therein, and without demand or notice, immediately due and payable. No waiver of this right shall be effective unless it is in writing. Consent by the Beneficiary to one such transaction shall not constitute waiver of the right to require such consent to succeeding transactions.**

This Note is secured by a Deed of Trust to **SUPERIOR LOAN SERVICING**, as Trustee.

JOANNE L. STRICKLAND – Borrower                          7/21/2017
                                                                          /Date

– Co-Borrower                                                          /Date

INTENTIONALLY BLANK

DO NOT DESTROY THIS NOTE: When paid, this Note, with Deed of Trust securing same, must be surrendered to the Trustee for cancellation before reconveyance or Trustee's Deed. This loan was originated by RUSHMYFILE, INC., License No. 01893519, NMLS No. 396905, a company licensed by the Bureau of Real Estate (formerly the Department of Real Estate).

# Exhibit D

**LENDER VESTING**

MARK CAPALONGAN AND SANDRA CAPALONGAN, HUSBAND AND WIFE AS JOINT TENANTS, AS TO AN UNDIVIDED 150,000/480,000 INTEREST; JIMMY HUI, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 90,000/480,000 INTEREST; JING FENG, A WIDOW, AS TO AN UNDIVIDED 60,000/480,000 INTEREST; HOU SANG WONG, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 100,000/480,000 INTEREST; GILBERT CHOY, AN UNMARRIED MAN, AS TO AN UNDIVIDED 80,000/480,000 INTEREST

| Lenders | % Ownership | Amount |
|---|---|---|
| MARK CAPALONGAN AND SANDRA CAPALONGAN | 31.25% | $150,000.00 |
| JIMMY HUI | 18.75% | $90,000.00 |
| JING FENG | 12.50% | $60,000.00 |
| HOU SANG WONG | 20.83% | $100,000.00 |
| GILBERT CHOY | 16.67% | $80,000.00 |



RECORDING REQUESTED BY

WHEN RECORDED MAIL TO

SUPERIOR LOAN SERVICING
24013 VENTURA BLVD., SUITE 200
CALABASAS, CA 91302
Loan No: RMF3119174

Property Address:
2192 1ST AVENUE
NAPA, CA 94558

APN: 052-140-003-000
OS300 17869-AP

**2017-0018273**

Recorded
Official Records
County of
Napa
JOHN TUTEUR
Assessor-Recorder-Co.

08:00AM 15-Aug-2017

REC FEE          102.00

EV
Page 1 of 19

SPACE ABOVE THIS LINE FOR RECORDERS USE

# DEED OF TRUST
# AND ASSIGNMENT OF RENTS

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19, 20 and 22. Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A) "Security Instrument"** means this document, which is dated JULY 19, 2017, together with all Riders to this document.

**(B) "Borrower"** is JOANNE L. STRICKLAND, AN UNMARRIED WOMAN. Borrower is the trustor under this Security Instrument. Borrower's mailing address is: 101 MULLER STREET, VALLEJO, CA 94590.

**(C) "Lender"** is EXHIBIT D. Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is SUPERIOR LOAN SERVICING, to whom Borrower irrevocably grants, transfers and assigns property, in Trust, with Power of Sale.

**(E) "Note"** means the promissory note signed by Borrower and dated JULY 19, 2017. The Note states that Borrower owes Lender FOUR HUNDRED EIGHTY THOUSAND DOLLARS exactly (U.S. $480,000.00) plus interest.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower: Assignment of Rents and Profits; Security Agreement and Protection of Lenders' Security Rider.

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners' association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** mean those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5 for (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (1) principal and interest under the Note, plus (2) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (a) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (b) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of NAPA, which currently has the address of **2192 1ST AVENUE, NAPA, CA 94558** and fully described as:

**SEE LEGAL DESCRIPTION ATTACHED**

**APN: 052-140-003-000**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity or (d) Electronic Funds Transfer. Additionally, Lender can require payment due to senior encumbrances, including insurance, in the forms listed above.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment(s) or partial payment(s) if the payment(s) or partial payments are insufficient to bring the Loan current. Lender may accept any payment(s) or partial payment(s)

insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment(s) or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender does not need to pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment(s) to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to any amounts under the Note owed by Borrower. Lender shall decide how to apply funds. Should a Notice of Default be of record, funds may be applied and the Notice of Default shall remain valid. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: First - interest due under the Note; Second - principal due under the Note; Third - amounts due under Section 3. However, should advances be made under this Deed of Trust, Lender has sole discretion as to the distribution as to how payments shall be applied when received. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.** Should Lender require, borrower or his successor shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 9. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 8 and pay such amount and Borrower shall then be obligated under Section 8 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (1) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (2) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust including borrower's covenants to make payments when due. Additionally, borrower shall pay all taxes, assessments, charges, including garbage billings, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder qf the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given (excluding Deed of Trust liens, which need no notice), Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (1) a onetime charge for flood zone determination, certification and tracking services or (2) a one-time charge for flood zone determination and certification services and subsequent charges each time re-mappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

Borrower is to provide and deliver evidence of insurance to lender, which is to the satisfaction of Lender.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made

promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (1) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (2) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property and allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration. Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause. Additionally, should Borrower be conducting illegal activity on or about the property, this shall constitute a breach under this security agreement.

**7. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, fraudulent, misleading, misrepresentation, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**8. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (1) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (2) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (3) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to, (1) paying any sums secured by a lien which has priority over this Security Instrument, (2) appearing in court, and (3) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. The parties hereto agree that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**9.    Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a nonrefundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 9 affects Borrower's obligation to pay interest at the rate provided in the Note.

**10.    Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment

of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11.   Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13.   Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, foreclosure fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14.   Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's Mailing Address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Mailing Address unless Borrower has designated a substitute notice address by notice to Lender.

**Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.**

Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument. Borrower requests that a copy of any Notice of Default and any Notice of Sale hereunder be mailed to Borrower at the Mailing Address stated herein, unless Borrower has designated another address by Notice to Lender.

**15.   Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (1) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (2) words in the singular shall mean and include the plural and vice versa, and (3) the word "may" gives sole discretion without any obligation to take any action.

**16.   Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17.   Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

In the event of sale or transfer, conveyance or alienation of said real property, or any part thereof, or any interest therein, whether voluntary or involuntary (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred), Beneficiary shall have the right of acceleration, at it's option, to declare the Note secured by the Deed of Trust, irrespective of the maturity date expressed therein, and without demand or notice, immediately due and payable. No waiver of this right shall be effective unless it is in writing. Consent by the Beneficiary to one such transaction shall not constitute waiver of the right to require such consent to succeeding transactions.

**18.   Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (i) five business days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (ii) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (iii) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, foreclosure fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19.   Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer(s) and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20.    Hazardous Substances.** As used in this Section 20: (1) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (2) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (3) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (4) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup .

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (1) that is in violation of any Environmental Law, (2) which creates an Environmental Condition or (3) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (1) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (2) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (3) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21.    Default.** Upon default by Borrower in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee, Agent of Beneficiary or Agent of Trustee, of written declaration of default and demand for sale and of written Notice of Default and of election to cause to be sold the Property, which notice Trustee, Agent of Beneficiary or Agent of Trustee shall cause to be filed for record. Trustee, Agent of Beneficiary or Agent of Trustee shall be entitled to rely upon the correctness of such notice.

After the lapse of such time as then may be required by law following the recordation of said Notice of Default and Notice of Sale having been given as then required by law, Trustee or Trustee's Agent, without demand on Borrower, shall sell the Property at the time and place fixed by it in said Notice of Sale, either as a whole or in separate parcels and in such order as Trustee or Beneficiary may determine at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee, or Trustee's Agent may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, expressed or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person including Borrower, Trustee or Beneficiary as herein defined, may purchase at such sale. Trustor hereby waives any and all rights expressed or implied under California Civil Code Section 2924g(b). All junior lienholders shall be bound by this as well.

If the Mortgaged Property consists of several lots, parcels or items of property, Beneficiary may: (a) designate the order in which such lots, parcels or items shall be offered for sale or sold, or (b) elect to sell such lots, parcels or items through a single sale, or through two or more successive sales, or in any other manner Beneficiary deems in its best interest. Any person, including Trustor, Trustee or Beneficiary, may purchase at any sale hereunder, and Beneficiary shall have the right to purchase at any sale hereunder by crediting upon the bid price the amount of all or any part of the indebtedness hereby secured. Should Beneficiary desire that more than one sale or other disposition of the Mortgaged Property be conducted, Beneficiary may, at its option, cause the same to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Beneficiary may deem to be in its best interests, and no such sale shall terminate or otherwise affect the lien of this Deed of Trust on any part of the Mortgaged Property not sold until all indebtedness secured hereby has been fully paid. In the event Beneficiary elects to dispose of the Mortgaged Property through more than one sale, Trustor agrees to pay the costs and expenses of each such sale and of any judicial proceedings wherein the same may be made, including reasonable compensation to Trustee and Beneficiary, their agents and counsel, and to pay all expenses, liabilities and advances made or incurred by Trustee in connection with such sale or sales, together with interest on all such advances made by Trustee at the lower of the rate set forth in the Note, or the maximum rate permitted by law to be charged by Trustee.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with

the sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the rate prescribed in the Note; all other sums then secured thereby, and the remainder, if any, to the person or persons legally entitled thereto.

22.   **The Agreement is Binding.** This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devises, administrators, executors, successors and assigns. The term "Beneficiary" shall mean the owner and holder, including pledgees, of the Note secured hereby, whether or not named as Beneficiary herein. In this Deed of Trust, whenever the contract so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural. As used herein, "fixtures" includes but is not limited to carpeting, built-in appliances, drapery and drapery rods, landscaping, water tanks, plumbing, machinery, air conditioners, ducts, and the like.

23.   **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, and if the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24.   **Grievances.** Neither Borrower nor Lender may commence, join, or be joined to any judicial action, except an appointment of a receiver and/or a judicial foreclosure (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 55.

25.   **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.

26.   **Multiple Lender Loans:** Pursuant to Civil Code Section 2941.9, if this Deed of Trust has more than one Beneficiary (Lender) with an undivided interest, it is subject to a signed agreement between all of the Lenders to be governed by the Lenders holding more than 50% of the record beneficial interest of this Deed of Trust. This may occur during escrow or after the close of escrow. Additionally, pursuant to Business & Professions Code Section 10238(i), the holders of more than 50% of the recorded beneficial interests of the notes or interests may govern the actions to be taken on behalf of all holders in accordance with Civil Code Section 2941.9 in the event of default or foreclosure for matters that require direction or approval of the holders, including designation of the broker, servicing agent, or other person acting on their behalf and the sale, encumbrance, or lease of real property owned by the holders resulting from foreclosure or receipt of a deed in lieu of foreclosure.

27.   **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

28.   **Senior Lien Information.** Lender may require information on any and all senior lien information from Borrower. Said request must be made in writing to Borrower. Borrower must submit the information to Lender within 20 days of the date of request. Said information can include, but is not limited to: name of senior lien holder, balance due, payment amount, next due date, address of lien holder, phone number of lien holder, loan number and amounts advanced.

29.   **Document Drawing Service.** If a document drawing service has been hired to draw loan documents, Borrower hereby agrees to indemnify and hold Document Drawing Service, its officers, agents and representatives harmless from and against any costs, expense (including, without limitation attorney fees, consulting fees and court costs).

30.   **Indemnification.** Borrower hereby agrees to indemnify (as the same are incurred or accrued) and hold Lender and its officers, agents, representatives harmless from and against any cost, expense (including, without limitation attorney fees, consulting fees and court costs), demand, claim or lawsuit arising out of or related to the Property or the Loan, including, but not limited to any claims made by contractors, suppliers, mechanics lien claimants, homeowner associations, governmental authorities, stop notice claimants, title companies or persons purporting to be injured on or by the Property or by the acts or conduct of Borrower, its contractors, subcontractors, suppliers and or other persons dealing with Borrower. If Borrower fails to provide such indemnity as the same accrues and as expenses are incurred, the amount

not paid shall be added to the principal amount of the Note and bear interest thereon at the same rate then in effect (including any default rate in effect) and shall be secured by the same collateral as securing the Note and Loan Agreement.

**31.   Acceptance by Lender of Partial Payment After Notice of Default.** By accepting partial payment (payments which do not satisfy a default or delinquency in full), or any sums secured by this Deed of Trust after a notice of default has been recorded, or by accepting late performance of any obligation secured by this Deed of Trust, or by adding any payments so made to the loans secured by this Deed of Trust, whether or not such payments are made pursuant to a court order, Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure to make any such payment promptly or to perform any such act. No exercise of any right or remedy of the Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law.

**32.   Unsecured Portion of Indebtedness.** If any part of the secured indebtedness cannot be lawfully secured by this Deed of Trust, or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is unsecured by this Deed of Trust.

**33.   Waiver of Marshalling; Other Waivers.** To the extent permitted by law, Borrower waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Mortgaged Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshalling in the event of foreclosure of the lien created by this Instrument, (iii) all rights and remedies which Borrower may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any other obligation secured by this Instrument, and (v) any rights, legal or equitable, to require marshalling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433. If the Mortgaged Property consists of several lots, parcels or items of property, Beneficiary may: (a) designate the order in which such lots, parcels or items shall be offered for sale or sold, or (b) elect to sell such lots, parcels or items through a single sale, or through two or more successive sales, or in any other manner Beneficiary deems in its best interest. Any person, including Trustor, Trustee or Beneficiary, may purchase at any sale hereunder, and Beneficiary shall have the right to purchase at any sale hereunder by crediting upon the bid price the amount of all or any part of the indebtedness hereby secured. Should Beneficiary desire that more than one sale or other disposition of the Mortgaged Property be conducted, Beneficiary may, at its option, cause the same to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Beneficiary may deem to be in its best interests, and no such sale shall terminate or otherwise affect the lien of this Deed of Trust on any part of the Mortgaged Property not sold until all indebtedness secured hereby has been fully paid. In the event Beneficiary elects to dispose of the Mortgaged Property through more than one sale, Trustor agrees to pay the costs and expenses of each such sale and of all judicial proceedings wherein the same may be made, including reasonable compensation to Trustee and Beneficiary, their agents and counsel, and to pay all expenses, liabilities and advances made or incurred by Trustee in connection with such sale or sales, together with interest on all such advances made by Trustee at the lower of the rate set forth in the Note, or the maximum rate permitted by law to be charged by Trustee.

**34.   125% Title Insurance Policy.** Borrower agrees to allow Lender to obtain a title policy in an amount exceeding the face amount of the loan by 25% and instruct insuring title company of same. Lender and Borrower acknowledge this increase of coverage is not for the allowance of negative amortization of the principal balance. This additional coverage is to pay for losses the Lender may incur in a case which could increase the amount above the original principal balance coverage. Said losses could include delinquent interest, late charges, attorney fees, advances for insurance, taxes, etc. Borrower acknowledges this increase of coverage does result in a higher fee which Borrower shall bear for the Lender title insurance policy.

**35.   Severability; Entire Agreement; Amendments.** The parties intend that the provisions of this Instrument and all other Loan Documents, including the Promissory Note evidencing the indebtedness secured hereby, shall be legally severable. If any term or provision of this Instrument or any other Loan Document, including the Promissory Note evidencing the indebtedness secured hereby, be determined to any extent by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document, including the aforesaid Promissory Note, shall not be affected thereby and each term and provision shall be valid and be enforceable to the fullest extent permitted by law. This Instrument and the aforesaid Promissory Note contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**36.   Property Assessed Clean Energy ("Pace") (Or Similar Type Program).** All Property Assessed Clean Energy ("PACE") (or similar type program) are prohibited. In the event that a PACE assessment/loan becomes a lien on the Property and becomes a part of the payment of property taxes or becomes senior to this Security Instrument in any way, Borrower shall be in breach of the note and this Security Instrument and Lender has the right to take all acts set forth in Security Instrument and to accelerate this Loan. The loan shall be in default and Lender may proceed under Section 21 of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____    7/21/2017
JOANNE L. STRICKLAND – Borrower                         /Date

_____    _____
– Co-Borrower                                           /Date

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ___Napa___ )

On __7/21/17__ before me, __Alorers, Notary Public__
                                (insert name and title of the officer)

personally appeared __JoAnne L Strickland__
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

A. GRECO
COMM. # 2140731
NOTARY PUBLIC - CALIFORNIA
NAPA COUNTY
COMM EXPIRES FEB. 20, 2020

## ILLEGIBLE NOTARY SEAL DECLARATION
### (GC 27361.7 and CCP 2015.5)

The notary seal on the document to which this statement is attached reads as follows:

Name of Notary    _A. Greco_____

Date Commission Expires   _Feb 20, 2020_____

County of Commission   _Napa_____

Commission Number   _2140731_____

"I certify (or declare) under the penalty of perjury under the laws of the State of California that the foregoing is true and correct."

Today's Date   _7/28/2017_____

_____
Signature of Declarant:

_Jay Bamba_____
Printed Name

(Updated 2/7/02)

# PROTECTION OF LENDER'S SECURITY RIDER

NOTICE:         THIS RIDER ADDS A PROVISION TO THE SECURITY INSTRUMENT ALLOWING THE LENDER TO
                REQUIRE PAYMENT OF THE LENDER'S ATTORNEY'S FEES IN BANKRUPTCY CASES.

THIS PROTECTION OF LENDER'S SECURITY RIDER is made JULY 19, 2017, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's note to EXHIBIT D (the "Lender") of the same date (the "Note") and covering the property described in the Security Instrument and located at: 2192 1ST AVENUE, NAPA, CA 94558 - Property address.

AMENDED COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PROTECTION OF LENDER'S SECURITY
In addition to the uniform covenant contained in section 8 of the Security Instrument, the following information is added:

8. Protection of Lender's Security. If Lender's interest in the Property is materially affected by any proceeding under the Bankruptcy Laws of the United States, Lender, at Lender's option, may take such action, including seeking relief under the Bankruptcy Laws, and disburse such sums, including reasonable attorney's fees, as is necessary to protect Lender's interest.

If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or Applicable Law.

Any amounts disbursed by Lender pursuant to this Section 8, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Deed of Trust. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this Section 8 shall require Lender to incur any expense or take any action hereunder.

By SIGNING BELOW, Borrower accepts and agrees to the terms and covenant contained in this PROTECTION OF LENDER'S SECURITY RIDER.


JOANNE L. STRICKLAND – Borrower                                          7/21/2017
                                                                        /Date


– Co-Borrower                                                           /Date

# RIDER TO DEED OF TRUST
# ASSIGNMENT OF RENTS AND PROFITS
# AND SECURITY AGREEMENT

**THIS RIDER** is made this JULY 19, 2017 and is incorporated into and shall be deemed to amend and supplement the Deed of Trust of even date given by the undersigned (the "Borrower") to secure Borrower's promissory note to SUPERIOR LOAN SERVICING, as Trustee for the benefit of EXHIBIT D ~ (collectively, "Lender") and covering the Property described in the Deed of Trust and located at 2192 1ST AVENUE, NAPA, CA 94558.

### 1. Assignment of Rents, Revenues and Profits

(a)  All of Borrower's interest in any leases, membership contracts, concessions agreements, rental agreements or any other agreements pertaining to the Property now existing or hereafter entered into, all of the rents, royalties, issues, profits, revenue, income and other benefits of the Property arising from the use or enjoyment of all or any portion thereof or from any lease or agreement pertaining to occupancy of any portion of the Property now existing or hereafter entered into whether now due, past due, or to become due, and including all unpaid rents, security deposits, prepaid membership fees and dues and other charges (the "Rents and Profits"), are hereby absolutely, presently and unconditionally assigned, transferred and conveyed to Lender to be applied by Lender in payment of the principal and interest and all other sums payable on the Note, and of all other sums payable under the Deed of Trust. Prior to the occurrence of any Event of Default; Borrower shall have a license to collect and receive all Rents and Profits, which license shall be terminable at the sole option of Lender, without regard to the adequacy of its security hereunder and without notice to or demand upon Borrower, upon the occurrence of any Event of Default. It is understood and agreed that neither the foregoing Assignment of Rents and Profits to Lender nor the exercise by Lender of any of its rights or remedies under the Deed of Trust shall be deemed to make Lender a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Property or the use, occupancy, enjoyment or operation of all or any portion thereof, unless and until Lender, in person or by agent, assumes actual possession thereof. Nor shall appointment of a receiver for the Property by any court at the request of Lender or by agreement with Borrower, or the entering into possession of the Property or any part thereof by such receiver, be deemed to make Lender a mortgagee-in-possession or otherwise responsible or liable in any manner with respect to the Property or the use, occupancy, enjoyment or operation of all or any portion thereof. Upon the occurrence of any Event of Default, this shall constitute a direction to and full authority to each lessee under any lease and each guarantor of any lease to pay all Rents and Profits to Lender without proof of the default relied upon. Borrower hereby irrevocably authorizes each lessee and guarantor to rely upon and comply with any notice or demand by Lender for the payment to Lender of any Rents and Profits due or to become due.

(b)  Borrower shall apply the Rents and Profits to the payment of all necessary and reasonable operating costs and expenses of the Property, debt service on the indebtedness secured hereby, and a reasonable reserve for future expenses, repairs and replacements for the Property, before using the Rents and Profits for Borrower's personal use or any other purpose not for the direct benefit of the Property.

### 2. Security Agreement  This Deed of Trust is intended to be a security agreement pursuant to the California Uniform Commercial Code for:

(a)  any and all items of personal property specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the California Uniform Commercial Code and which are not in this Deed of Trust effectively made part of the real property, including, without limitation, Borrower's interest in all building materials, fixtures, equipment and machinery incorporated or to be incorporated into improvements constructed and to be constructed on the Property together with all interest of the Borrower in all personal property, appliances, equipment and cost of goods now or hereafter owned or possessed by Borrower located upon, in, or about or used in connection with the Property, including, without limitation, any and all personal property necessary for the operation and maintenance of any business located on the property, together with all increases, substitutes, replacements, proceeds and products thereof and additions and accessions thereto, all rents, issues and profits due or to become due Borrower from or pertaining to said real property, Borrower's interest in any monies deposited by or on behalf of Borrower with any city, county, public body, utility or agency for the installation or as security for the installation of any utility pertaining to the Property, all rights to the use of any trade name, trademark or service mark now or hereafter associated with the business or businesses conducted on said premises (subject, however, to any franchise or license agreements relating thereto) together with all rights of borrower under any policy or policies of insurance covering the foregoing property and all proceeds, loss payments and premium refunds which may be payable with respect to such insurance policies or any other insurance policies insuring said real or personal property and the proceeds of any involuntary disposition, including without limitation any tort judgment proceeds; and

(b)  any and all items of property specified above as part of the Property which, under Applicable Law, constitute fixtures and may be subject to a security interest under Section 9334 and/or 9604 California Uniform Commercial Code.

Borrower hereby grants Lender a security interest in said property, all of which is referred to in this Deed of Trust as "Personal Property," and in all additions thereto, substitutions therefor and proceeds thereof, for the purpose of securing all indebtedness and other obligations of Borrower now or hereafter secured by this Deed of Trust, which shall be a paramount and superior lien on all such Personal Property at all times. Borrower agrees to execute and deliver financing and continuation statements covering the Personal Property from time to time and in such form as Lender may require to perfect and continue the perfection of Lender's lien or security interest with respect to the Personal Property. Borrower shall pay all costs of filing such statements and renewals and releases thereof and shall pay all reasonable costs and expenses of any record searches for financing statements Lender may reasonably require. Upon the occurrence of any default of Borrower hereunder, Lender shall have the rights and remedies of a secured party under The California Uniform Commercial Code, including, Section 9604 thereof, as well as all other rights and remedies available at law or in equity.

Notwithstanding anything to the contrary contained in this Paragraph 2, Borrower may from time to time replace items of personal property and fixtures constituting a part of the Property, provided that:

(1) the replacements for such items of personal property or fixtures are of equivalent value and quality;

(2) Borrower has good and clear title to such replacement property free and clear of any and all liens, encumbrances, security interests, ownership interests, claims of title (contingents or otherwise), or charges of any kind, or the rights of any conditional sellers, vendors or any third parties in or to such replacement property have been expressly subordinated at no cost to Lender to the lien of the Deed of Trust in a manner satisfactory to Lender; and

(3) at the option of Lender, Borrower provides at no cost to Lender a satisfactory opinion of counsel to the effect that the Deed of Trust constitutes a valid and subsisting first lien on and security interest in such replacement property and is not subject to being subordinated or the priority thereof affected under any applicable law, including, but not limited to, the provisions of California Commercial Code Sections 9334 and/or 9604.

**IN WITNESS WHEREOF**, Borrowers have executed this Rider as of the date first above written.

_____          _____  7/2/2017
JOANNE L. STRICKLAND – Borrower                                           /Date /


_____          _____
– Co-Borrower                                                            /Date

# RIDER TO DEED OF TRUST

The following provisions are a part of and incorporated into that certain Deed of Trust and Assignment of Rents dated as of JULY 19, 2017, by and between JOANNE L. STRICKLAND ("Trustor"), SUPERIOR LOAN SERVICING ("Trustee") and EXHIBIT D ("Beneficiary").

## Assignment of Rents and Profits

(a) **Present Assignment.** All of Trustor's interest in any leases or other occupancy agreements pertaining to the Property now existing or hereafter entered into, and all of the rents, royalties, issues, profits, revenue, income and other benefits of the Property arising from the use or enjoyment of all or any portion thereof or from any lease or agreement pertaining to occupancy of any portion of the Property now existing or hereafter entered into whether now due, past due, or to become due, and including all prepaid rents and security deposits (the "Rents and Profits"), are hereby absolutely, presently and unconditionally assigned, transferred and conveyed to Beneficiary to be applied by Beneficiary in payment of the principal and interest and all other sums payable on the Note and under this Deed of Trust subject to the rights of residential tenants under California Civil Code Section 1950.5(d). Beneficiary waives the right to exercise the rights and powers assigned to Beneficiary herein and agrees not to revoke such waiver until and unless an event of acceleration (as set forth in Section 4 of the Deed of Trust) occurs. It is understood and agreed that neither the foregoing assignment of Rents and Profits nor the exercise by Beneficiary of any of its rights or remedies hereunder shall be deemed to make Beneficiary a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Property or the use, occupancy, enjoyment or operation of all or any portion thereof, unless and until Beneficiary, in person or by agent, assumes actual possession thereof. Nor shall appointment of a receiver for the Property by any court at the request of Beneficiary or by agreement with Trustor, or the entering into possession of the Property or any part thereof by such receiver, be deemed to make Beneficiary a "mortgagee-in-possession" or otherwise responsible or liable in any manner with respect to the Property. Upon the occurrence of any event of default, this shall constitute a direction to and full authority to each lessee under any lease to pay all Rents and Profits to Beneficiary without proof of the default. Trustor hereby irrevocably authorizes each lessee to rely on and comply with any notice or demand by Beneficiary for the payment to Beneficiary of any Rents and Profits due or to become due.

(b) **Application of Rents.** Trustor shall apply the Rents and Profits to the payment of all necessary and reasonable operating costs and expenses of the Property, and debt service on the indebtedness secured hereby, before using the Rents and Profits for Trustor's personal use or any other purpose not for the direct benefit of the Property.

(c) **Notice to Tenants.** Trustor shall at all times perform the obligations of lessor under all such leases. Trustor shall at any time or from time to time, upon request of Beneficiary, transfer and assign to Beneficiary in such form as may be satisfactory to Beneficiary, Trustor's interest in any lease, subject to and upon the condition, however, that prior to the occurrence of any event of default hereunder Trustor shall have a license to collect and receive all Rents and Profits under such lease upon accrual, but not prior thereto, as set forth in Paragraph (a) above. Whenever requested by Beneficiary, Trustor shall furnish to Beneficiary a certificate of Trustor setting forth the names of all lessees under any leases, the terms of their respective leases, the space occupied, the rents payable thereunder, and the dates through which any and all rents have been paid.

(d) **Attornment.** Each lease for any part of the Property shall make provision for the attornment of the lessee thereunder to any person succeeding to the interest of Trustor as the result of any foreclosure or transfer in lieu of foreclosure hereunder.

(e) **Direct Creditor.** Beneficiary shall be deemed to be the creditor of each lessee in respect of any assignments for the benefit of creditors and any bankruptcy, arrangement, reorganization, insolvency, dissolution, receivership or other debtor-relief proceedings affecting such lessee (without obligation on the part of Beneficiary, however, to file timely claims in such proceedings or otherwise pursue creditor's rights therein). Beneficiary shall have the right to assign Trustor's right, title and interest in any leases to any subsequent holder of this Deed of Trust or any participating interest therein or to any person acquiring title to all or any part of the Property through foreclosure or otherwise. Any subsequent assignee shall have all the rights and powers herein provided to Beneficiary. Beneficiary shall have the authority, as Trustor's attorney-in-fact, such authority being coupled with an interest and irrevocable, to sign the name of Trustor and to bind Trustor on all papers and documents relating to the operation, leasing and maintenance of the Property.

(f) **Miscellaneous.** _____

_____                    _____
JOANNE L. STRICKLAND – Borrower                                    7/24/2017  /Date


_____                    _____
– Co-Borrower                                                                     /Date

Page 16 of 16

ORDER NO. : 0530017869

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Napa, State of California, and is described as follows:

A portion of an unnumbered tract of land in the Northeast corner thereof as shown on the Map entitled, "Map of Part of East Napa, E. R. Sproul's Addition", filed September 7, 1875, in Book 1 of Maps, at Page 98, in the Office of the County Recorder of said Napa County, described as follows:

Commencing at a point on the Easterly line of the land conveyed to the County of Napa by Deed recorded December 10, 1935, in Book 102, at Page 285 of Official Records of Napa County, distant thereon 1333.32 feet Northerly from the point of intersection thereof with the Southerly line of the land conveyed to Emma M. Virden by Deed recorded May 12, 1937, in Book 118, at Page 355 of Official Records of Napa County, said point being also the Northwesterly corner of the 0.33 acre tract conveyed to Alford O. Johnson, et ux., recorded in Book 165, at Page 456 of Official Records of Napa County; running thence Northerly along said Easterly line of land so conveyed to the County of Napa, 66.68 feet, more or less, to its intersection with the Southerly line of land conveyed to H. B. Kelson, et ux., by Deed recorded April 25, 1941, in Book 162, at Page 334 of Official Records of Napa County; thence Easterly along said Southerly line of said land so conveyed to H. B. Nelson, et ux., and on a line parallel with the Southerly line of the land so conveyed to Emma M. Virden hereinabove referred to, to the Easterly line of E. R. Sproul's Addition, as shown on the Map hereinabove referred to; thence Southerly along said Easterly line of said E. R. Sproul's Addition, 66.68 feet, more or less, to the Northeasterly corner of the 0.33 acre tract above referred to; thence Westerly along the Northerly line of said 0.33 acre tract, 220 feet, more or less, to the point of commencement.

APN:   052-140-003-000

**END OF DOCUMENT**

# Exhibit D

**LENDER VESTING**

MARK CAPALONGAN AND SANDRA CAPALONGAN, HUSBAND AND WIFE AS JOINT TENANTS, AS TO AN UNDIVIDED 150,000/480,000 INTEREST; JIMMY HUI, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 90,000/480,000 INTEREST; JING FENG, A WIDOW, AS TO AN UNDIVIDED 60,000/480,000 INTEREST; HOU SANG WONG, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 100,000/480,000 INTEREST; GILBERT CHOY, AN UNMARRIED MAN, AS TO AN UNDIVIDED 80,000/480,000 INTEREST

| Lenders | % Ownership | Amount |
| --- | --- | --- |
| MARK CAPALONGAN AND SANDRA CAPALONGAN | 31.25% | $150,000.00 |
| JIMMY HUI | 18.75% | $90,000.00 |
| JING FENG | 12.50% | $60,000.00 |
| HOU SANG WONG | 20.83% | $100,000.00 |
| GILBERT CHOY | 16.67% | $80,000.00 |



**PAYMENT STATEMENT - FEBRUARY 2018**



"Superior Service for Superior Clients"

24013 Ventura Blvd., Suite 200
Calabasas, CA 91302

**BORROWER**

Joanne L. Strickland
2192 First Avenue
Napa CA 94558

☐ Check here for a change of mailing address or phone number(s). Please provide all corrections on the reverse side.

| PAYMENT INFORMATION | | |
|---|---|---|
| Loan Account | | ▮▮41 |
| Statement Date | | 2/1/2018 |
| Payment Amount | + | $1,866.39 |
| Past Due Payments | + | $5,599.17 |
| Late Charges Due | + | $711.67 |
| Unpaid Interest | + | $0.00 |
| Unpaid Charges | + | $45.00 |
| Deferred Charges | – | $0.00 |
| **Total Amount Due** | = | **$8,222.23** |
| **Payment Due Date** | | **2/1/2018** |
| Late Charge Due After 2/11/2018 | | $186.64 |
| Additional Principal | $ | |
| Additional Trust | $ | |
| Total Amount Enclosed | $ | |

--- PLEASE DETACH THE TOP PORTION OF THIS STATEMENT, RETURN IT WITH YOUR PAYMENT AND RETAIN THE BOTTOM PORTION FOR YOUR RECORDS ---



"Superior Service for Superior Clients"

24013 Ventura Blvd., Suite 200
Calabasas, CA 91302

| LOAN & PROPERTY INFORMATION | |
|---|---|
| Principal Balance | $220,000.00 |
| Reserve Balance | $0.00 |
| Impound Balance | $0.00 |
| Interest Rate | 9.990% |
| Interest Paid in 2018 | $0.00 |
| Property Information | 101 Muller Street Vallejo CA 94590 |

| PAYMENT INFORMATION | | |
|---|---|---|
| Loan Account | | ▮▮41 |
| Statement Date | | 2/1/2018 |
| Payment Amount | + | $1,866.39 |
| Past Due Payments | + | $5,599.17 |
| Late Charges Due | + | $711.67 |
| Unpaid Interest | + | $0.00 |
| Unpaid Charges | + | $45.00 |
| Deferred Charges | – | $0.00 |
| **Total Amount Due** | = | **$8,222.23** |
| **Payment Due Date** | | **2/1/2018** |
| Late Charge Due After 2/11/2018 | | $186.64 |

* To avoid a late charge of $186.64, we must receive your payment by 2/11/2018 during our business hours. If this date falls on a weekend or holiday, your payment must be received by the next business day.

Please advise us immediately of any discrepancies in the transactions or investment activity on your statement of account or if you contemplate changing your address. When making inquiries by telephone or in writing please give your account number. We urge you to keep this statement with your investment records.

| ACCOUNT ACTIVITY (1/1/2018 – 1/31/2018) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Transaction Date | Pmt Due Date | Reference | Description | Transaction Amount | Interest | Principal | Late Chgs | Other | Trust | Principal Balance |
| | | | Balance Forward | | | | | | | $220,000.00 |
| 1/3/2018 | | 0052980 | Payment - O her | $3,732.78 | $0.00 | $0.00 | $0.00 | $0.00 | $3,732.78 | $220,000.00 |
| 1/5/2018 | | 0052980 | NSF | ($3,732.78) | $0.00 | $0.00 | $0.00 | $0.00 | ($3,732.78) | $220,000.00 |
| 1/5/2018 | | | NSF Payment Charge | ($45.00) | $0.00 | $0.00 | $0.00 | ($45.00) | $0.00 | $220,000.00 |
| | | | | | $0.00 | $0.00 | $0.00 | ($45.00) | $0.00 | |



 Gmail

Raisin Cane <raisincane2015@gmail.com>

## Second email regarding properties
2 messages

**Raisin Cane** <raisincane2015@gmail.com>                   Wed, Jan 3, 2018 at 4:10 PM
To: roni@superiorloanservicing.com

Hello,
I am emailing to address my payments for the three properties. I have not been receiving regular communication in the mail about them.
I had reported to Isaac that I was in the middle of a refinance with the firehouse ▉▉▉▉▉13. Severely impacted by the wildfires in the North Bay here, I lost three months of income and multiple revenue generating events with my business. I have filed suit with attorneys for that loss. I also experienced a delay of  three months as I legally had to take possession of many items left by previous owners and dispose of them before I could make the property functionable. The good news is that tenants are moving in and it will become a very productive asset. Please reconsider the default notice and I ask consideration for some waived late fees due to the circumstances stated above. My intention is to keep property and pay up all fees owed in the next two months.

In addition, the Napa property suffered loss of income as it was at ground zero for the fires and was in a major evacuation area. For this also, I ask patience and consideration.

Thank you very much for your time and consideration. I will eagerly await a response from your review.

Regards,

JoAnne Strickland

**Raisin Cane** <raisincane2015@gmail.com>                   Sat, Jun 29, 2019 at 3:18 PM
To: Matt <email@mellenlawfirm.com>

[Quoted text hidden]



2018-0005251

| RECORDING REQUESTED BY: | Recorded | REC FEE | 18.00 |
|---|---|---|---|
| **WFG National Default Services** | Official Records County of Napa | HOUSING TAX | 75.00 |
| WHEN RECORDED MAIL TO: | JOHN TUTEUR | | |
| **Asset Default Management, Inc.** | Assessor-Recorder-Co. | | |
| **24013 Ventura Blvd., Suite 200** | | EV | |
| **Calabasas, California 91302** | 08:39AM 20-Mar-2018 | Page 1 of 2 | |

*18-159832*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No.: **2018-00567**      Loan No.: **RMF3119174**    APN: **052-140-003-000**

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

## IMPORTANT NOTICE
## IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,
and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

   This amount is **$36,359.92 as of 3/16/2018,** and will increase until your account becomes current.  While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

   Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

TS No.: **2018-00567**        Loan No.: **RMF3119174**

### NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## MARK CAPALONGAN AND SANDY CAPALONGAN, ET TAL
### C/O Asset Default Management, Inc.
### 24013 Ventura Blvd., Suite 200
### Calabasas, California 91302
### Phone: (818) 629-2272

**If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.**

## Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN:  That **SUPERIOR LOAN SERVICING** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 7/19/2017, executed by **JOANNE L. STRICKLAND, AN UNMARRIED WOMAN**, as Trustor, to secure certain obligations in favor of **MARK CAPALONGAN AND SANDRA CAPALONGAN, HUSBAND AND WIFE AS JOINT TENANTS, AS TO AN UNDIVIDED 150,000/480,000 INTEREST; JIMMY HUI, A MARRIED MAN , AS HIS SOLE AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 60,000/480,000 INTEREST; HOU SANG WONG, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY, AS TO AN UNDIVIDED 100,000/480,000 INTEREST; GILBERT CHOY, AN UNMARRIED MAN, AS TO AN UNDIVIDED 80,000/480,000 INTEREST,**  as beneficiary, recorded 8/15/2017, as Instrument No. **2017-0018273**, in Book , Page ,    of Official Records in the Office of the Recorder of  **Napa** County, California describing land therein as: As more fully described in the Deed of Trust

Including one **NOTE(S) FOR THE ORIGINAL** sum of **$480,000.00**, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:
     **Installment of Principal and/or Interest plus impounds and/or advances which became due on 12/1/2017 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable. As a condition of reinstatement all property taxes and insurance must be current and proof must be provided.**

     That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

**Dated: 3/16/2018**

                    SUPERIOR LOAN SERVICING, BY ASSET DEFAULT
                    MANAGEMENT, INC., AS AGENT FOR TRUSTEE

          BY:_____
                    JULIE TABERDO, SR. TRUSTEE SALE OFFICER



Efile
7/18/2019

1   *Prepared by:*

2   Matthew D. Mellen (Bar No. 233350)
    Brenna Wood Fitzpatrick (Bar No. 325666)
3   MELLEN LAW FIRM
    1050 Marina Village Parkway, Suite 102
4   Alameda, CA 94501
    Telephone:  (510) 263-9638
5   Facsimile:   (415) 276-1902

6   Attorney for Plaintiffs,
    JoAnne Strickland,
7   Clean! The Series, LLC

8

9                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                            **COUNTY OF NAPA**

11

12  JOANNE     STRICKLAND,    an    individual;   | Case No.: 19cv000899
    CLEAN! THE SERIES, LLC, a business entity;
13                                                |
                    Plaintiffs,                   |  [~~PROPOSED~~] ORDER
14                                                |
             v.                                   |
15                                                |
    LIL'   WAVE   FINANCIAL,   INC.   D/B/A        |
16  SUPERIOR LOAN SERVICING, a business           |
    entity; MARK CAPALONGAN, an individual;       |
17  SANDRA   CAPALONGAN,   an   individual;       |  Date:     July 23, 2019
    JIMMY HUI, an individual; JING FENG, an       |  Time:     8:30 A.M.
18  individual; HOU SANG WONG, an individual;     |  Dept.:    B
    GILBERT CHOY, an individual; and DOES 1-      |
19  15, inclusive                                 |  Action Filed:   June 13, 2019
                                                  |  Trial Date:     None Set
20                    Defendants.                 |

21

22

23

24

25

26

27

28

                              [PROPOSED] ORDER

**FILED**

JUL 23 2019

Clerk of the Napa Superior Court
By: _____
              Deputy

Plaintiff JOANNE STRICKLAND's (hereinafter, "Plaintiff") Motion for Preliminary Injunction came on before the undersigned at 8:30 AM on July 23, 2019, in Department B of the above-captioned Court. Having considered the Motion, Memorandum of Points and Authorities, supporting declarations, arguments of counsel, and GOOD CAUSE APPEARING THEREFORE:

**IT IS HEREBY ORDERED**

The Court hereby restrains the Foreclosure Sale of Plaintiff's property, located at 2192 1st Avenue, Napa, CA 94558 ("the Property"), pending resolution of this matter. Defendant LIL' WAVE FINANCIAL, INC. D/B/A SUPERIOR LOAN SERVICING shall cease any and all foreclosure activity regarding the Property for the duration of this lawsuit.

**IT IS SO ORDERED.**

Dated: July 23, 2019

Superior Court Judge

1
[PROPOSED] ORDER



**Superior Court of California**
**County of Napa**

**Minutes**

**Case #: 19CV000899          JoAnne Strickland et al vs MARK CAPALONGAN et al**

| **Hearing Date:** | 07/23/2019 | **Hearing Time:** | 8:30 AM |
|---|---|---|---|
| **Judicial Officer:** | Monique Langhorne | **Clerk:** | K Koen |
| **Court Reporter:** | | **Interpreter:** | |
| **Courtroom:** | Department B | | |

**Parties Present:**

| Wood Fitzpatrick, Brenna Alice | Attorney |
|---|---|
| Wells, Kristi | Attorney -via court call |

|                                    **NATURE OF PROCEEDINGS**                                    |
|---|

The matter comes on calendar regularly this date for a Other Hearing.

|                                    **HEARING**                                    |
|---|

There being no request for oral argument, the Court orders the following tentative ruling shall be adopted and incorporated into the minutes of the Court, making it the order of the Court:

RULING: The notice of motion does not provide notice of the Court's tentative ruling system as required by Local Rule 2.9. Plaintiffs' counsel is directed to contact defendants' counsel forthwith and advise defendants' counsel of Local Rule 2.9 and the Court's tentative ruling procedure. If plaintiffs' counsel is unable to contact defendants' counsel prior to the hearing, plaintiffs' counsel shall be available at the hearing, in person or by telephone, in the event defendants' counsel appears without following the procedures set forth in Local Rule 2.9.

Plaintiffs Joanne Strickland and Clean! The Series, LLC s motion for a preliminary injunction is GRANTED. Plaintiffs seeks an order restraining defendants Lil Wave Financial, Inc. dba Superior Loan Servicing (Loan Servicing), Mark Capalongan, Sandra Capalongan, Jimmy Hui, Jing Feng, Hou Sang Wong, and Gilbert Choy from foreclosing on her property on 1st Avenue in Napa during the pendency of this matter. [A]s a general matter, the question whether a preliminary injunction should be granted involves two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief. (Jay Bharat Developers, Inc. v. Minidis (2008) 167 Cal.App.4th 437, 443, quoting White v. Davis (2003) 30 Cal.4th 528, 554; see IT Corp. v. Cnty. of Imperial (1983) 35 Cal.3d 63, 72.)

The Strickland declaration alone provides more than enough evidence to demonstrate plaintiffs are likely to prevail on the merits of their third cause of action for interference with prospective economic advantage, fourth cause of action for interference with contract, fifth cause of action for breach of the covenant of good faith and fair dealing, and seventh cause of action for violation of Business and Professions Code section 17200. (See Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1153 [elements of the tort of intentional interference with prospective advantage]; Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) 50 Cal.3d 1118, 1126 [elements of the tort of intentional interference with contractual relations]; Comunale v. Traders & Gen. Ins. Co. (1958) 50 Cal.2d 654, 658 [ There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. ].)

Plaintiffs' evidence shows Loan Servicing interfered, and continues to interfere, with Strickland s attempts to refinance her loans. (Strickland Decl.,  16-17; Morse Decl.,  3, 5, 13.) In August 2018, broker George Thanh

Quang Nguyen secured a refinance loan approval on the Alabama Street property with funds to reinstate the other two properties as well. (Strickland Decl., 18.) But Loan Servicing talked the new potential lender out of refinancing the loan. (Id.) Eventually, plaintiffs entered into a contractual relationship with a new lender, who agreed to refinance the loans. (Id., 19.) Loan Servicing made this difficult by reneging on previous negotiations with the new lender setting the payoff amount. (Id., 20-21.) Thus, in order to finalize the loan on the 1st Avenue property, the new lender needed the final payoff amount of the loan. (Id., 22.) It took Loan Servicing two weeks to produce the payoff demand for the 1st Avenue property despite the fact it had scheduled a foreclosure sale a week later. (Id., 22-23.) This has hindered the new lender s ability to close a loan before the foreclosure sale. (Id., 25.) Further, the payoff amounts Loan Servicing produced for the 1st Avenue property contained' plainly unlawful and unreasonable fees such as $7,000 in foreclosure fees, $13,000 in late charges, and $5,000 of attorney s fees. (Id., 27.) The Vallejo properties also contained such fees. (Id., 28-29.) But for these charges and fees, plaintiffs could have cured the default, reinstated the loan, and avoided foreclosure. (Id., 30.) Additionally, the promissory notes on the properties contain a misleading clause on late payments and Balloon late charges. (Id., 21.) Based on this evidence, plaintiffs have demonstrated defendants have both intentionally interfered with plaintiffs' contractual relations, with her prospective economic advantage, and breached the covenant of good faith and fair dealing. These actions additionally would constitute unfair business practices.

Plaintiffs also show the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief weighs in their favor. Strickland s primary residence is the 1st Avenue property. (Id., 2.) Plaintiffs will suffer irreparable injury if the property is sold to a third party and she is no longer able to live in her home. Defendants have submitted no evidence they will be harmed.

Plaintiffs are required to obtain an undertaking. The preliminary injunction is conditioned on plaintiffs obtaining an undertaking in the amount of $25,000.

The Court executed the Order in the form submitted.

| FUTURE HEARINGS |
| --- |

July 23, 2019 8:30 AM Motion
Department B
Langhorne, Monique

November 21, 2019 8:30 AM Conference: Case Management
Department B
Langhorne, Monique

-o0o-



# CALIFORNIA LEASE AGREEMENT

THIS AGREEMENT is made and entered into this __1st__ day of __FEBRUARY__ __2016__ between
(Day)              (Month)              (Year)

__JOANNE STRICKLAND__ "Owner/Agent", whose address and phone
(Name of Owner/Agent)

number are __101 MULLER STREET, VALLEJO, CA. 94590__ __707-260-5622__
(Address and Telephone of Owner/Agent)

and __JOSE ALFREDO NUNEZ, MARIA LOPEZ NUNEZ__ "Resident."
(List all Residents who will sign this Agreement)

THE PARTIES AGREE AS FOLLOWS:

1. **RENTAL UNIT:** Subject to the terms and conditions of this Agreement, Owner rents to Resident and Resident rents from Owner, for residential use only,

the premises located at: __2192 FIRST AVENUE__, Unit # (if applicable) __N/A__.
(Street Address)

__NAPA__ CA, __94558__
(City)              (Zip)

2. **RENT:** Rent is due in advance on the __1ST__ day of each and every month, at $__3100.00__ per month, beginning on

__02/01/2016__, payable to Owner/Agent at __101 MULLER STREET, VALLEJO, CA. 94590__
(Date)              (Address where payments should be delivered)

Payments made in person may be delivered to Owner/Agent between the hours of __10:00 AM__ and __6:00 PM__ on the following days of the week:

☐ Monday  ☒ Tuesday  ☐ Wednesday  ☐ Thursday  ☒ Friday  ☐ Saturday  ☐ Sunday  ☒ Other __PER AGREEMENT__

Acceptable methods of payment:
☐ Personal Check  ☐ Cashier's Check  ☒ Money Order  ☐ EFT/Credit (see Owner/Agent for details) and ☐ Cash

If rent is paid after the __10TH__ of the month, there will be a late charge of $__50.00__ assessed. The parties agree that this late fee is presumed to be the amount of damage sustained by late payment of rent. It would be impracticable or extremely difficult to fix the actual damage. This sum represents a reasonable endeavor by the Owner/Agent to estimate fair actual compensation for any loss that may be sustained as a result of late payment of rent. Pursuant to California law, if Resident passes a check on insufficient funds, Resident will be liable to Owner/Agent for the amount of the check and a service charge of $__25.00__, not to exceed $25 for the first check passed on insufficient funds, and $35 for each subsequent check passed on insufficient funds. The Owner/Agent may refuse a personal check as the form of rent payment to cure a Three-Day Notice to Pay Rent or Quit.

Owner may apply any payment made by Tenant to any obligation of Tenant to Owner notwithstanding any dates or other direction from Tenant that accompanies any such payment. Any attempt by Tenant to allocate a payment in any other way shall be null and void, including the use or application of a restrictive endorsement on the face of any check.

3. **SECURITY DEPOSIT:** Resident shall deposit with Owner/Agent, as a security deposit, the sum of $__3500__

☒ prior to taking possession of the unit **or** ☐ no later than __PRIOR TO POSSESSION__ (check one).

Resident shall not use the security deposit to pay any month's rent. Owner/Agent may withhold from the security deposit only such amounts as are reasonably necessary to remedy Resident defaults including, but not limited to, the following:
(a) defaults in the payment of rent,
(b) to repair damages to the premises caused by Resident, exclusive of ordinary wear and tear, and/or
(c) to clean the premises, if necessary, upon termination of the tenancy in order to return the unit to the same level of cleanliness it was in at the inception of the tenancy, and/or
(d) to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear.

No later than 21 calendar days after Owner/Agent has regained possession of the premises, Owner/Agent shall return any remaining portion of such security deposit to Resident. Any remaining portion of the security deposit shall be returned in the



*California Apartment Association Approved Form*
*www.caanet.org*
**Form 2.1** – Revised 12/12 - ©2012 – All Rights Reserved
*Page 1 of 5*

**Unauthorized Reproduction of Blank Forms is Illegal.**



form of a single check made out to all Residents listed above. After either the Owner/Agent or the Resident provides notice to terminate the tenancy, the Owner/Agent and Resident may mutually agree to have the Owner/Agent deposit any remaining portion of the security deposit electronically to a bank account or other financial institution designated by the Resident or to another form or method of return.

**4. TERM:** The term of this Agreement is for <u>24 MO.</u>, beginning on <u>02/012016</u> and ending on <u>02/01/2018</u>
_(Term)_ _(Date)_ _(Date)_

at which time this Lease shall terminate without further notice. Any holding over thereafter shall result in Resident being liable to Owner/Agent for daily rental damages equal to the current market value of the unit, divided by 30. A "month-to-month" tenancy subject to the terms and conditions of this agreement shall be created only if Owner/Agent accepts rent from Resident thereafter, and if so accepted, tenancy may be terminated by Resident after service upon the Owner/Agent of a written 30-day Notice of Termination. Except as prohibited by law, that month-to-month tenancy may be terminated by the Owner/Agent by service upon the Resident of a written 60-day notice of termination of tenancy. However, Civil Code Section 1946.1 provides that "if any tenant or resident has resided in the dwelling for less than one year", the Owner/Agent may terminate the tenancy by service upon the Resident of a written 30-day notice.

**5. UTILITIES:** Resident shall pay for all utilities, services and charges, if any, made payable by or predicated upon occupancy of Resident, **except**: <u>ALL PAID BY OCCUPANT</u>

Resident shall have the following utilities connected at all times during the tenancy (check as applicable):
☒Gas ☒Electric ☒Water ☒Trash ☒Sewer ☒Other: <u>ALL UTILITIES</u>

Disconnection of utilities due to non-payment is a material violation of this Agreement.

Resident shall not use common area utilities (such as water or electricity) for the Resident's personal use, without prior written permission from the Owner/Agent.

**6. CASH PAYMENT:** The Owner/Agent may demand or require cash as the exclusive form of payment of rent or security deposit if the Resident has previously attempted to pay the Owner/Agent with a check drawn on insufficient funds or the Resident has stopped payment on a check, draft, or money order. If the Owner/Agent chooses to demand or require cash payment under these circumstances, the Owner/Agent shall give the Resident a written notice stating that the payment instrument was dishonored and informing the Resident that the Resident shall pay in cash for a period determined by Owner/Agent, not to exceed three months, and attach a copy of the dishonored instrument to the notice.

**7. OCCUPANTS:** Premises shall be occupied only by the following named person(s):

<u>Jose Alfredo Nunez</u>    <u>03/19/1973</u>        <u>Maria Lopez Nunez</u>    <u>09/05/1975</u>
_Name_ _Birthdate_ _Name_ _Birthdate_

_Name_ _Birthdate_ _Name_ _Birthdate_

_Name_ _Birthdate_ _Name_ _Birthdate_

**8. PROHIBITIONS:** Without Owner/Agent's prior written permission as an addendum to this Agreement, no pets, waterbeds, charcoal burners or other open-flame cooking devices, or liquefied petroleum gas fueled cooking devices ("grills") or
<u>INOPERABLE VEHICLES / TRASH PILES / EYE SORES</u>
shall be kept or allowed in or about the premises.

**9. SMOKING PROHIBITION:** Smoking of tobacco products is prohibited everywhere on the premises, including in individual units and interior and exterior common areas, **unless** Owner/Agent has adopted a different policy that is attached as an addendum to this Agreement. (Check a box if an addendum is attached.)

❒ This property's policy with respect to allowing smoking is in the attached addendum.

❒ This property is subject to a local non-smoking ordinance. The policy for this property is in the attached addendum.

Resident shall inform his or her guest(s) of this Smoking Prohibition. Resident shall promptly notify Owner/Agent in writing of any incident where tobacco smoke is migrating into Resident's unit from sources outside of Resident's unit. Resident acknowledges that Owner/Agent's adoption of this policy, does not make the Owner/Agent the guarantor of the Resident's health or of the smoke-free condition of the areas listed above. However, Owner/Agent shall take reasonable steps to enforce

---



_California Apartment Association Approved Form_
www.caanet.org
**Form 2.1** – Revised 12/12 - ©2012 – All Rights Reserved
Page 2 of 5

**Unauthorized Reproduction of Blank Forms is Illegal.**



this provision. Owner/Agent shall not be required to take steps in response to smoking unless Owner/Agent has actual knowledge or has been provided written notice. Owner/Agent and Resident agree that the other residents of the property are the third party beneficiaries of this provision. A resident may sue another resident to enforce this provision but does not have the right to evict another resident. Any lawsuit between residents regarding this provision shall not create a presumption that the Owner/Agent has breached this Agreement. A breach of this provision by the Resident shall be deemed a material breach of the Rental/Lease Agreement and grounds for immediate termination of the Rental/Lease Agreement by the Owner/Agent.

**10. QUIET ENJOYMENT:** Resident and Resident's guest(s) shall not violate any criminal or civil law, ordinance or statute in the use and occupancy of the premises, commit waste or nuisance, annoy, molest or interfere with any other person on the property, or neighbor. Any such action may result in the immediate termination of this Agreement as provided herein and by law.

**11. FINES AND PENALTIES:** Resident is responsible for any fines or other costs occasioned by violations of the law by Resident or Resident's guests on the premises or property while Resident is in possession. If any such fines or costs are levied against Owner/Agent, Resident agrees to pay such fines or costs attributed to Resident's tenancy or the conduct of Resident, Resident's guests or others at the premises, upon receipt of an invoice from Owner/Agent. The obligation to pay fines and costs assessed against Owner/Agent may be in addition to any assessed directly against Resident.

**12. REPAIRS AND ALTERATIONS:** Resident shall make a written request to Owner/Agent regarding any repairs, decorations or alterations contemplated. Except as provided by law, no repairs, decorating or alterations shall be done by Resident without Owner/Agent's prior written consent. This includes, but is not limited to, painting, wallpapering, and changing locks. Resident may not make any alterations to cable or telephone inside wiring (such as may occur when changing telecommunications providers or adding phone lines) without prior written consent of the Owner/Agent. The consent request regarding proposed alterations to inside wiring shall include the name, address, and telephone number of any new telecommunications providers. Resident agrees to pay all costs resulting from the alteration and agrees to pay to the Owner/Agent any costs associated with restoring the inside wiring to the condition at the time of move-in, except for reasonable wear and tear. Resident shall hold Owner/Agent harmless and indemnify Owner/Agent as to any mechanic's lien recordation or proceeding caused by Resident.

**13.  ACCEPTANCE OF PREMISES:** Resident has inspected the premises, furnishings and equipment, and has found them to be satisfactory. All plumbing, heating and electrical systems are operative and deemed satisfactory.

**14. CARE, CLEANING AND MAINTENANCE:**  Except as prohibited by law, Resident agrees:

    (a) to keep the premises as clean and sanitary as their condition permits and to dispose of all rubbish, garbage and other waste, in a clean and sanitary manner, unless Owner/Agent has expressly agreed otherwise in writing in an addendum to this Agreement;

    (b) to properly use and operate all electrical, gas and plumbing fixtures and keep them as clean and sanitary as their condition permits;

    (c) to keep the premises and furniture, furnishings and appliances, and fixtures, which are rented for Resident's exclusive use, in good order and condition;

    (d) not to willfully or wantonly destroy, deface, damage, impair or remove any part of the structure or dwelling unit or the facilities, equipment, or appurtenances thereto or to permit any person on the premises, to do any such thing;

    (e) to occupy the premises as a residence, utilizing portions thereof for living, sleeping, cooking or dining purposes only which were respectively designed or intended to be used for such purposes.

    (f) to leave the premises in the same condition as it was received, subject to normal wear and tear, as its condition permits.

    (g) to return the premises, upon move-out to the same level of cleanliness it was in at the inception of the tenancy.

    (h) to pay Owner/Agent for costs to repair, replace or rebuild any portion of the premises damaged by the Resident, Resident's guests or invitees.

    (i) to promptly advise Owner/Agent of any items requiring repair, such as light switches or dripping faucets. Resident shall make repair requests as soon after the defect is noted as is practical.

**15. LANDSCAPING:** Resident ☐ is ☐ is not (check one) responsible for the upkeep of the yard and maintenance of the landscaping, including watering, mowing, weeding and clipping, or ☐ please see attached Addendum. Resident shall promptly advise Owner/Agent of any problems with the landscaping, including, but not limited to, dead grass, plants or tree limbs, insect infestations, discolored or yellowing foliage and insufficient irrigation or leaks. Resident may not delegate the responsibilities of this paragraph to any person, including a contractor or other landscaping professional.



**Unauthorized Reproduction of Blank Forms is Illegal.**

**16. SMOKE DETECTION DEVICE:** The premises are equipped with a functioning smoke detection device(s), and Resident shall be responsible for testing the device weekly and immediately reporting any problems, maintenance or need for repairs to Owner/Agent. If battery operated, Resident is responsible for changing the detector's battery as necessary. Resident may not disable, disconnect or remove the detector. Owner/Agent shall have a right to enter the premises to check and maintain the smoke detection device as provided by law.

**17. CARBON MONOXIDE DETECTION DEVICE:** If the premises are equipped with a functioning carbon monoxide detection device(s), Resident shall be responsible for testing the device weekly and immediately reporting any problems, maintenance or need for repairs to Owner/Agent. If battery operated, Resident is responsible for changing the detector's battery as necessary. Resident may not disable, disconnect or remove the detector. Owner/Agent shall have a right to enter the premises to check and maintain the carbon monoxide detection device as provided by law.

**18. RENTERS INSURANCE:** Resident's property is not insured by Owner/Agent. Resident is not a co-insured and is expressly excluded from coverage under any insurance policy held by Owner/Agent which is now in effect or becomes effective during the term of this Agreement. (CHECK ONE BOX)

☑ Resident is required to maintain renters insurance throughout the duration of the tenancy as specified in the attached Renters Insurance Addendum. Resident must provide proof of such insurance to the Owner/Agent:

❏ within 30 days of the inception of the tenancy.

❏ prior to occupancy.

❏ by _____,
                       *(date)*

Failure to comply with this requirement is a material violation of the Rental/Lease Agreement.

☐ Resident is encouraged but not required to obtain renters insurance.

**19. WAIVER OF BREACH:** The waiver by either party of any breach shall not be construed to be a continuing waiver of any subsequent breach. The receipt by Owner/Agent of the rent with the knowledge of any violation of a covenant or condition of this agreement shall not be deemed a waiver of such breach. No waiver by either party of the provisions herein shall be deemed to have been made unless expressed in writing and signed by all parties to this Agreement.

**20. JOINT AND SEVERAL LIABILITY:** The undersigned Resident(s), whether or not in actual possession of the premises, are jointly and severally liable for all obligations under this Agreement and shall indemnify Owner/Agent for liability arising prior to the return of possession to the Owner/Agent for personal injuries or property damage caused or permitted by Resident(s), their guests, and invitees. This does not waive "Owner/Agent's duty of care" to prevent personal injury or property damage where that duty is imposed by law.

**21. ENTRY:** California law allows Owner/Agent or his/her employee(s) to enter the premises for certain purposes during normal business hours. The Owner/Agent will provide written notice to the Resident prior to the entry of the dwelling unit whenever required by state law. (Civil Code Section 1954.) Resident's non-compliance with Owner/Agent's lawful request for entry is a material breach of this Agreement that may be cause for immediate termination as provided herein and by law.

**22. SUBLETTING AND ASSIGNMENT:** No portion of the premises shall be sublet nor this Agreement assigned. Any attempted subletting or assignment by Resident shall, at the election of Owner/Agent, be an irremediable breach of this Agreement and cause for immediate termination as provided herein and by law.

**23. BREACH OF LEASE:** In the event that Resident breaches this Lease Agreement, Owner/Agent shall be allowed at Owner/Agent's discretion, but not by way of limitation, to exercise any or all remedies provided Owner/Agent by California Civil Code Section 1951.2 and 1951.4. Damages Owner/Agent "may recover" include the worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award, or for any shorter period of time specified in the Lease Agreement, exceeds the amount of such rental loss for the same period that the Resident proves could be reasonably avoided.

**24. SALE OF PROPERTY:** In the event of the sale or refinance of the property: If Owner/Agent presents to Resident a "Resident's Certification of Terms - Estoppel Certification," or other similar Estoppel Certification form, Resident agrees to execute and deliver the certificate acknowledging that this Agreement is unmodified and in full force and effect, or in full force



*California Apartment Association Approved Form*
www.caanet.org
***Form 2.1*** *– Revised 12/12 - ©2012 – All Rights Reserved*
*Page 4 of 5*

**Unauthorized Reproduction of Blank Forms is Illegal.**



and effect as modified with the consent of Owner/Agent, and stating the modifications, within ten (10) days of written notice. Failure to comply shall be deemed Resident's acknowledgement that the certificate as submitted by Owner/Agent is true and correct and may be relied upon by any lender or purchaser.

**25. NOTICE:** Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**26. ADDENDA:** By initialing as provided below, Resident(s) acknowledge receipt of the following applicable addenda (as checked), copies of which are attached hereto and are incorporated as part of this Agreement.

| | |
|---|---|
| ☑ Asbestos Addendum (Form 17.1) | ☐ Resident Policies Addendum (Form 17.0) |
| ☐ Bedbug Addendum (Form 36.0) | ☐ Satellite Dish and Antenna Addendum (Form 2.5) |
| ☑ CC&Rs Addendum (Form 2.9) | ☐ Smoke Detector Addendum (Form 27.0) |
| ☑ Carbon Monoxide Detector (Form 27.1) | ☐ Smoking Policy Addendum (Form 34.0) |
| ☐ Day Care Addendum (Form 28.0) | ☐ Unlawful Activity Addendum (Form 2.4) |
| ☑ Furniture Inventory (Form 16.1) | ☐ Waterbed Addendum (Form 14.0) |
| ☑ Grilling Addendum (Form 35.0) | ☑ Other    NO ADDENDAS TO THIS CONTRACT |
| ☑ Guarantee of Rental/Lease Agreement (Form 41.0) | ☐ Other _____ |
| ☑ Lead-Based Paint Addendum (Form LEAD1) | ☐ Other _____ |
| ☑ Mold Notification Addendum (Form 2.7) | ☐ Other _____ |
| ☑ Move In/Move Out Itemized Statement (Form 16.0) | ☐ Other _____ |
| ☑ Pest Control Notice Addendum (Form 2.6) | ☐ Other _____ |
| ☑ Pet Addendum (Form 13.0) | ☐ Other _____ |
| ☑ Political Signs Addendum (Form 39.0) | ☐ Other _____ |
| ☑ Pool Rules Addendum (Form 15.0) | ☐ Other _____ |
| ☑ Proposition 65 Brochure | ☐ Other _____ |
| ☑ Renters Insurance Addendum (Form 12.0-MF) | ☐ Other _____ |

Resident(s) initials here: ___ *JLN* ___    ___ *MLN* ___    _____

**27. ENTIRE AGREEMENT:** This Agreement, which includes all attachments referred to above, constitutes the entire Agreement between the parties and cannot be modified except in writing and signed by all parties, except as permitted by applicable law. Neither Owner/Agent, nor any agent or employee of Owner/Agent has made any representations or promises other than those set forth herein.

**28. CREDIT REPORTS:** A negative credit report reflecting on your credit history may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. Resident expressly authorizes Owner/Agent (including a collection agency) to obtain Resident's consumer credit report, which Owner/Agent may use if attempting to collect past due rent payments, late fees, or other charges from Resident, both during the term of the Agreement and thereafter.

**29. ATTORNEYS' FEES:** If any legal action or proceeding is brought by either party to enforce any part of this Agreement, the prevailing party shall recover, in addition to all other relief, reasonable attorneys' fees and court costs, unless one of the following two boxes is checked:
☐ the prevailing party shall recover, in addition to all other relief, attorneys' fees not to exceed $ _____, plus court costs.
Or
☐ each party shall be responsible for their own attorneys' fees and court costs.

The undersigned Resident(s) acknowledge(s) having read and understood the foregoing, and receipt of a duplicate original.

| | |
|---|---|
| 01/13/2016    Maria Lopez Nunez | 01/13/2016    Jose Alfredo Nunez |
| *Date*    *Resident* | *Date*    *Resident* |
| | |
| *Date*    *Resident* | *Date*    *Resident* |
| 01/17/2016    JOANNE STRICKLAND | |
| *Date*    *Owner/Agent* | |



*California Apartment Association Approved Form*
*www.caanet.org*
***Form 2.1** – Revised 12/12 - ©2012 – All Rights Reserved*
*Page 5 of 5*

**Unauthorized Reproduction of Blank Forms is Illegal.**





**2021-0030315**

| | Recorded | REC FEE | 18.00 |
|---|---|---|---|
| | Official Records | | |
| | County of | HOUSING TAX | 75.00 |
| | Napa | | |
| | JOHN TUTEUR | | |
| | Assessor-Recorder-Co. | | |
| | | MS | |
| | 08:03AM 27-Sep-2021 | Page 1 of 2 | |

**WFG National-Default Services**

RECORDING REQUESTED BY
Asset Default Management, Inc.

AND WHEN RECORDED MAIL TO:
Asset Default Management, Inc.
7525 Topanga Canyon Blvd.
Canoga Park, California 91303

*18-159132*

T.S. No.: 2018-00567      Loan No.: RMF3119174      APN: 052-140-003

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF TRUSTEE'S SALE

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 7/19/2017. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor: **JOANNE L. STRICKLAND, AN UNMARRIED WOMAN**
Duly Appointed Trustee: **SUPERIOR LOAN SERVICING**
Recorded 8/15/2017 as Instrument No. 2017-0018273 in book , page   of Official Records in the office of the Recorder of Napa County, California,
Date of Sale: 10/22/2021 at 1:30 PM
Place of Sale:     At the fountain to the right of the Napa Superior Court, 1111 Third Street, Napa CA 94559
Amount of unpaid balance and other charges: $930,024.61
Street Address or other common designation of real property:     **2192 1ST AVENUE**
**NAPA, CA 94558**

A.P.N.: 052-140-003
**"As Is Where Is"**

The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (714) 730-2727 or visit this Internet Web site www.servicelinkASAP.com, using the file number assigned to this case 2018-00567. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

NOTICE TO TENANT: You may have a right to purchase this property after the trustee auction pursuant to Section 2924m of the California Civil Code. If you are an "eligible tenant buyer," you can purchase the property if you match the last and highest bid placed at the trustee auction. If you are an "eligible bidder," you may be able to purchase the property if you exceed the last and highest bid placed at the trustee auction. There are three steps to exercising this right of purchase. First, 48 hours after the date of the trustee sale, you can call (714) 730-2727, or visit this internet website www.servicelinkASAP.com, using the file number assigned to this case 2018-00567 to find the date on which the trustee's sale was held, the amount of the last and highest bid, and the address of the trustee. Second, you must send a written notice of intent to place a bid so that the trustee receives it no more than 15 days after the trustee's sale. Third, you must submit a bid so that the trustee receives it no more than 45 days after the trustee's sale. If you think you may qualify as an "eligible tenant buyer" or "eligible bidder," you should consider contacting an attorney or appropriate real estate professional immediately for advice regarding this potential right to purchase.

Date: 9/23/2021

SUPERIOR LOAN SERVICING, BY ASSET DEFAULT
MANAGEMENT, INC., AS AGENT FOR TRUSTEE
7525 Topanga Canyon Blvd.
Canoga Park, California 91303
Sale Line: (714) 730-2727

Julie Taberdo, Sr. Trustee Sale Officer